In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-26-00019-CV
_____

IN THE INTEREST OF T.R.C.

On Appeal from the County Court at Law No. 3
Montgomery County, Texas
Trial Cause No. 14-10-11718

**OPINION**

Mother appeals the trial court's order terminating her parental rights to her minor child, T.R.C. ("Tim").[1] Termination of parental rights should be reserved for "extreme cases[.]" *See In the Int. of H.S.*, No. 24-0307, 2026 Tex. App. LEXIS 533, at *2 (June 5, 2026). "[A] parental-termination order must always be a last resort and never a first impulse." *Id*. We echo what was said by now Chief Justice Blacklock in *In the Int. of A.M.*:

---

[1]To preserve the parties' privacy, we use pseudonyms to refer to the child, Mother, foster parents, and family members. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

1

> Most of the [appeals] this Court receives in parental-termination cases involve parents whose severe abuse or abandonment of their children, debilitating drug addiction, or violent and criminal behavior provide the clear and convincing evidence required for imposition of the draconian remedy of termination. This case is more difficult than most. It raises close questions of evidentiary sufficiency.

630 S.W.3d 25, 26 (Tex. 2019) (Blacklock, J.; concurring in the denial of the petition for review). We conclude the evidence is legally insufficient to support the trial court's finding that the Department of Family and Protective Services ("the Department") made reasonable efforts to return Tim to Mother before trial and that despite such efforts a continuing danger remains in the home that prevents Tim's return to Mother. *See* Tex. Fam. Code Ann. § 161.001(f)(1). We, therefore, reverse the trial court's order terminating Mother's parental rights as to Tim, and render judgment that Mother's rights are not terminated. We also conclude the trial court abused its discretion in ordering that the Department is Tim's permanent managing conservator, because the trial court did not make the finding required by section 153.002(c)(1). *See id.* § 153.002(c)(1). Therefore, we reverse the trial court's order appointing the Department as Tim's permanent managing conservator.

**The Scope of Our Review vs. The Parameters of Our Opinion**

Although our legal sufficiency review requires us to conduct a thorough review of the entire record, our rules of procedure require us to "hand down a written opinion that is as brief as practicable but that addresses every issue raised and *necessary to final disposition of the appeal*." Tex. R. App. P. 47.1 (emphasis added).

2

The distinction between what is reviewed and what is included in the opinion is particularly important in an appeal from a parental-termination order. "Appellate opinions in these important cases should distinguish between facts that support termination and facts that do not, rather than reciting every piece of evidence relied upon by the government." *In the Int. of A.M.*, 630 S.W.3d at 27 (Blacklock, J., concurring in the denial of the petition for review). We will attempt to heed Justice Massengale's wise "caution against the dangers of kitchen-sink approaches to opinion writing, particularly in the area of parental-termination appeals." *In the Int. of A.K.T.*, No. 01-18-00647-CV, 2018 Tex. App. LEXIS 10018, at *47 (Tex. App.—Houston [1st Dist.] Dec. 6, 2018, pet. denied) (mem. op.) (Massengale, J., concurring); *see also In the Int. of K.N.*, No. 24-0881, 2026 Tex. App. LEXIS 535, at *30 n.3 (June 5, 2026) (declining to recount evidence that "is not the basis of our judgment[,]" noting, "A kitchen-sink approach risks misleading lower courts as to what evidence matters.").

We will not, therefore, rehearse all the evidence the Department offered at trial and now argues on appeal as support for the trial court's statutory-predicate and best-interest findings. As explained below, we do not reach those issues; instead, we decide this case by answering a separate question—whether the evidence is legally sufficient to establish, clearly and convincingly, that despite reasonable efforts by the Department to return Tim to Mother, a continuing danger remains in the home

3

that prevents his return. *See* Tex. Fam. Code Ann. § 161.001(f)(1). When deciding what evidence to include in our opinion, we have attempted to focus on the evidence that answers that question. Nevertheless, voluminous records were introduced at trial, and in order to comply with Rule 47.1, we must include sufficient details from those records to explain our disposition of this appeal. *See* Tex. R. App. P. 47.1

**Factual Background**

When Tim was 17 months old, he was diagnosed with Type 1 diabetes, a serious condition which requires careful monitoring of Tim's blood-sugar level. Too low a level can be immediately life-threatening; too high a level risks diabetic ketoacidosis which can potentially cause coma.

Tim has a brother, "Chris," who is one year younger than Tim. Mother has another son, "Trevor" who is several years older than Tim and Chris, and who was an adult at the time of trial. In 2016, when Tim was four and Chris was almost three, their parents divorced. The Final Decree of Divorce, signed in early 2017, appointed Mother as Tim's and Chris's sole managing conservator. Father, who was appointed possessory conservator, was to have periods of visitation, but these would be supervised by Tim's grandmother or someone else approved by Mother, because the court found credible evidence Father engaged in a pattern of abuse and neglect directed at Mother and the children. Before any such visitation would be allowed, however, Father—and anyone else who would be supervising Tim during Father's

4

periods of possession—would have to complete diabetes education training. No such requirement was placed on Mother who was granted the exclusive right to consent to the boys' medical, dental, surgical, psychiatric and psychological treatment.[2]

In September 2018, when Tim was six and Chris was five, Father died in a motorcycle accident. Years later, when the Department filed this action to terminate Mother's parental rights in 2024, Tim and Chris were referred to Elizabeth Salmeron, Ph.D., for comprehensive psychological evaluations. The Department's caseworker, Casandra Duran, informed Dr. Salmeron that Tim and Chris had been placed in separate homes, and that "the brothers do not have healthy boundaries . . . they fight often." Dr. Salmeron did not testify, but her reports which were admitted into evidence indicate that both boys were dealing with multiple issues, including "grief and loss[.]" Tim expressed to Dr. Salmeron that he wished Father had "[n]ot crash[ed] on that day" and that his "dad could come back and the dogs and we all be together again as a family and the whole world not do bad things."

Based on information obtained from Tim's paternal uncle, with whom Tim had been temporarily placed, Dr. Salmeron's report indicates that Tim exhibited "the following problematic behaviors to a moderate to clinically significant degree:" feels sad; feels down on himself; worries a lot; fidgets or unable to sit still; distracts easily;

---

[2]Father maintained the right to consent to non-invasive medical and dental treatment for the boys during Father's periods of possession, and surgical treatment in the event of emergency.

has trouble concentrating; acts as if he were driven by a motor; fights with other children; does not listen to rules; does not understand other people's feelings; teases others; refuses to share; takes things that do not belong to him; wants things right away; seems "hyperactive;" temper tantrums; and avoids talking about his feelings. Although Tim's paternal uncle also reported that Tim "seems fearful of things that are reminders of the situation with his mom[,]" when Dr. Salmeron asked Tim the "one thing [he] want[ed] most in life[,]" Tim responded, "To be back with my mom." Tim also told Dr. Salmeron, "I want to see my mom more often[,]" and when asked what he wished Mother would do differently, he replied, "I think she's perfect." As for what made Tim sad, he said, "My brother not being with my mom and me not being with my mom."

Although Tim was, at the time of his evaluation in January 2025, "currently functioning within the below average range in cognitive ability[,]" Dr. Salmeron's report indicates his prognosis was "Fair[,]" and she recommended a "Specialized" level of care. Her report states:

> [Tim] has the necessary cognitive resources to build a productive problem-solving foundation; results suggest [Tim] has the potential to exercise positive stress tolerance and control choices. [Tim] comprehends the importance of cooperation; [Tim] is a good-natured child who benefits from validation, structure and routine. Uncle says [Tim] "is doing okay." However, assessment information suggests Tim's internal interpretation of his surroundings is influenced by stress; the impact of early significant loss and trauma also shapes how Tim is learning to "cope" with life. [Tim] has trouble imagining productive outcomes to events; test data show gaps in age level problem solving

skills sets. [Tim's] private thoughts are marked by stress and tension, taking energy that could otherwise be channeled to build a stable coping structure. Given his age, [Tim] likely uses indirect ways of "signaling" needs for support, such as with anxiety-driven behaviors ("aggressive and dominates brother"; "argues with teacher"); the impact of early trauma may interrupt the healing process and leave [Tim] prone to inconsistent response to intervention over time. Test data suggest potential to internalize instead of express feelings; therefore, [Tim] is prone to denial, repression, minimization and avoidance over responsible assertiveness. The effects of uneven processing can exacerbate social problems as [Tim] may have trouble understanding and remembering what is expected of him in an organized fashion. Therefore, helping [Tim] develop productive communication and coping skills using trust-based discipline practices will be an important part of his treatment plan.

We provide more details about the treatment plan recommended by Dr. Salmeron in our analysis below. But first, we believe it is necessary to include a description of events referenced in the medical records introduced during the trial, because the Department relies on those events in arguing that a continuing danger remains in the home because Mother is unable to manage Tim's diabetes, unable to manage Tim's behavior, and unfit to care for both Tim and Chris.

Three exhibits containing over 12,700 pages of medical records pertaining to Tim were introduced during the trial, but only a handful of those records were ever discussed. The Department separately introduced six exhibits containing 33 pages excerpted out of the 12,700 pages and used those six exhibits to question Mother about the number of times she removed Tim from a hospital against medical advice. Only one other witness mentioned the medical records, citing them, globally, as the

7

basis for her concerns about Mother's having removed Tim from hospitals against medical advice. Other witnesses expressed similar concerns without mentioning the records as the source of their knowledge, but none of the witnesses claimed to have any medical expertise other than a paramedic. The paramedic, readily conceding that lab values, metabolic status and treatment were "beyond [his] level of ability to testify[,]" provided limited testimony about diabetes in general and said that it was necessary for Tim to be transported to a hospital due to elevated blood-sugar on October 26, 2024. He never referred to, nor explained, any of the medical records.

No doctor or nurse testified, either at trial or by way of deposition. In short, nobody provided any medical testimony explaining anything contained in the 12,700 pages of medical records introduced into evidence in the trial court and eventually forwarded to us as part of the appellate record. With that disclaimer, we provide the following information from the records, focusing mainly on the events described therein, touching on the medical information only as necessary to provide context for those events, and hopefully avoiding speculation on medical issues in the absence of medical testimony to explain the records.[3]

---

[3]On appeal, the Department lists seven times Mother removed Tim against medical advice, and our review provides excerpts of the records regarding each, along with excerpts of other medical records containing relevant information.

**December 5, 2018**

When Tim was 6 years old, Mother called 911 and an ambulance transported Tim to the emergency department at Texas Children's Hospital ("TCH") The Woodlands due to "decreased PO intake [and] varying blood sugars (high and low)" one day after Tim had undergone tonsillectomy and adenoidectomy surgery. According to the records, Mother was "being demanding" and "interfering with patient care" while at TCH The Woodlands. "Per mother, she left AMA [against medical advice] because it took doctor so long to treat patient and were waiting on more blood work[.]" A social worker got involved and called Child Protective Services ("CPS") because the medical staff was unsure whether Mother would take the child elsewhere for treatment. "Per mother, they left and went straight to Memorial Hermann ER. She is aware that CPS was called." Memorial Hermann later reported to TCH West Tower (located in the Houston Medical Center) that Mother did, in fact, take Tim to Memorial Hermann, where blood work was done, Tim received fluids, and Memorial Hermann discharged him home. According to the records, Mother continued monitoring Tim's blood sugar levels at home, and later that same day she called the endocrinology clinic which recommended that she take him to the emergency center, at which time she took him to TCH West Tower. The records reveal that while at TCH West Tower, Mother was "upset and yelling at healthcare staff at 0210 because PCA did not respond appropriately when she called.

9

Morning BG elevated at 292. Mother again upset and yelling this morning at 0800 because she reports that staff is not checking Tim's BG levels often enough and is concerned that he is ketotic."

**June 23, 2019**

When Tim was 7 years old, Mother took Tim to the Kingwood Medical Center Emergency Department and reported that Tim had "passed a large 'bright red blood clot' during a BM today." According to the records, Mother explained that Tim had been treated at TCH for abdominal pain, fever and gastrointestinal bleeding but was discharged two days prior with instructions to go to the emergency room if symptoms returned.[4] After waiting in the Kingwood emergency department for almost an hour, Mother left against medical advice. The records indicate the reason for leaving was: "Wait too long, Refused transfer, wants to drive pt to TCH. wait too long for transfer with EMS." The records also indicate, "Doctor aware that mother does not want to wait for transfer to Texas Children's Hospital downtown and would rather leave AMA at this time… Per doctor's order at this time she would like for primary nurse to put in a CPS case/phone call." The records indicate that thirty-four

---

[4]The records from TCH confirm Tim had, in fact, been seen at TCH The Woodlands on June 20, 2019, for fever and bloody diarrhea and that Tim was discharged home on June 21, 2019, despite Mother's statement that "she does not feel comfortable taking child home with continued diarrhea, fever, and elevated blood sugars."

minutes later, Mother and Tim arrived at TCH The Woodlands' emergency department where Tim was treated and later discharged.

**June 8, 2020**

When Tim was 8 years old, someone identified as "step dad" dropped Tim off at TCH The Woodlands's emergency department because Tim "was more tired than normal." According to the records, "BS on arrival was 533, with Ketones 7.2." Tim was diagnosed with diabetic ketoacidosis (DKA) and was admitted to the pediatric intensive care unit. Mother called and told the social worker that the night before, she took Tim to Taco Bell, watched him administer an insulin bolus, and then dropped him off at his paternal grandparents' house so that Mother and her "entire family" could pack their things and move to another apartment since their current one had repeatedly been broken into. According to the records, "Mother stated she 'hasn't been able to stop crying' since she found out patient was admitted[]" but she would not be able to come to the hospital until the next morning, stating that her ID was expired and that of her "husband" had been given to the police during their investigation of the break-in, and had not been returned. The records further indicate,

> [Social Worker] was involved due to initiate discharge planning along with CDE and clinical nutritionist as recommended. Mom was not at bedside to initiate discharge planning and education. Mom had reported to night shift that she would be here 06/09/2020 between 0600-0800 to bring home supplies. After numerous unsuccessful attempts to reach mom, [Social Worker] called for a wellness check. When PD arrived at house, mom stated she was sending a gentleman over to pick up the patient. PD initiated a CPS case at this time. The gentleman arrived with

11

no ID and was not allowed to pick up patient. As caregiver needed to be at bedside to receive discharge instruction, education and reinforcement regarding Type 1 DM management. Both mother and CPS arrived shortly after. Mother was visibly upset and frustrated. At this time, we tried consoling mother and letting her know that there still needs to be education to be provided and that with the sensitivity regarding the CPS case, [Tim] was not medically cleared for discharge. Mother continued to be uncooperative and at this time left against medical advice. CPS and [Social Worker] continues to be involved and will be following.

….

CPS recommended not to release patient to mother initially, then agreed to let them go AMA[.]

**July 9, 2021**

When Tim was 9 years old, Mother took Tim to the emergency center at TCH West Tower and stated that they had been "around town most of the day, and when they checked [Tim's] glucose this evening for dinner it was 551." She expressed concerns that Tim's "Omnipod was malfunctioning" so she gave him an injection and some water, but he couldn't drink much due to nausea and when she checked again it was "still elevated in the 400s," so she gave him another injection. The records indicate that Tim's nausea had "resolved" and his labs were "reassuring" as he did not meet the criteria for DKA, but "aggressive subcutaneous management" was recommended. The records indicate,

After discussion with endocrine, recommendations made to mother including POC glucose, correction factor dosing, monitoring for additional 2 hrs. Mother became upset, threatened staff, stated that "we did not know about diabetes", and that she needed to leave now. Mother

12

had already fed patient Whataburger, gave 2.5 units insulin. We attempted to help to facilitate more rapid additional treatment, reiterated recommendations, however mother refused additional interventions. [Patient] had already pulled out his IV. Mother refused to sign AMA paperwork however this remains AMA. Endocrine on call notified.

….

Mother at nurses (sic) station and raised voice at nurses, EC MD brought to nurse's station for update. Mother continued to escalate as she was escorted to room by two EC MD's. Security called to bedside. After discussion with endocrine and EC medical staff, mother refused to stay for 2 hour observation per endocrine recommendations and mother reports patient removed the IV himself. Mother refused to sign AMA paperwork and left EC with security due to behavior. [Social Worker] notified.

**June 15, 2023**

When Tim was 11 years old, Tim was transported by ambulance at the emergency center at TCH West Tower, arriving around 8:00 p.m. According to the records, Tim had threatened to harm his brother, and Mother was "concerned for suicidal ideation." "No acute medical issues [were] identified." Mental health services evaluated Tim, and inpatient psychiatric placement was recommended. Around 10:00 p.m., Tim was examined by Mary Hofstetter, MD, and was medically cleared. According to the nurse's notes, around 11:00 p.m., Tim "escalat[ed] after sitter change… [Tim] called the sitter a 'pedophille' (sic) because sitter said she would need to accompany him to the bathroom for his safety. [Tim] was in the sitter's face saying he had corona virus; sitter continued to ask [Tim] to sit back.

13

[Tim] said he would hit her as well." Around that time, Mother "returned to bedside after getting coffee[,]" and a different sitter was assigned. By 3:08 p.m. the next day, Tim was still "[p]ending inpatient psychiatric placement[.] Medically cleared[,]" but one facility had "deferred admission" and another was listed only as a "potential" placement and was "still determining if able to perform insulin[.]" Around 6:00 p.m., twenty-two hours after admission, and with no placement confirmed, Mother "verbalized desire to leave with the patient." Ashley Czaplicki, DO, was notified, and her 6:23 p.m. entry states:

> Called to bedside by nurse. Mother expressed frustration that placement is taking too long and she wishes to leave the hospital. She is frustrated with pt staying in same room for so long and is worried about insulin regimen. I explained that we are following endocrinology recommendations closely. Explained that placement is more difficult given underlying type I diabetes. Mother states that she does not want to wait any longer and would like to take him home. I explained that MHS and our team recommend inpatient treatment and are concerned that he could harm himself/others, disability, have worsening of his condition, and death. Mother expressed understanding and states that "has done this multiple times before. I don't care if you call CPS. I've had CPS visit 10 times before." Mother expressed understanding that she was leaving against medical advice. Advised return to ER for any worsening of condition such as increased aggression, voicing thoughts of harming self/others, fever, high blood glucose, or unable to eat/drink. Explained that she can return to ER at any time. Mother expressed understanding and agreement.

**July 8, 2024**

This Court takes judicial notice that on July 8, 2024, Hurricane Beryl struck Montgomery County. Although it is unclear how Mother, Tim and Chris were

14

affected, medical records from November 2024 indicate, "Mother stated she filed for FEMA money from Hurricane Beryl in July 2024 and they have been staying at an extended stay hotel."

**July 25, 2024**

Tim woke up vomiting, and his blood glucose was 266, so Mother "called EMS for concerns for borderline DKA[,]" and Tim was transported to TCH The Woodlands. Tim, who was 12 years old at the time, was admitted to the PICU, and was seen by Bonnie McCann-Crosby, MD, for a Diabetes Consult on June 26, 2024. Her narrative states,

> [Tim] reports that he has been feeling bad for the past few days but he didn't want to tell his mom because he doesn't like going to the doctor… He is on Omnipod 5 insulin pump and the pump expired yesterday. He reports that he has been missing doses and sneaking food. He does not enter carb amounts in his pump. Mom feels that the Omnipod has not been working as well as his previous Tandem pump. She reports that the pump does not always connect with his Dexcom properly and he is often kicked out of auto mode and either in manual mode or limited mode. He is rotating his pump only on his arms. Doses immediately before eating if he pre-boluses. Reports that blood glucoses in general are in the 200s.
>
> ….
>
> Impression:
> Established DKA (DKA Resolved w/o ketones)
> [Tim] is a 12 y.o. [] male with type 1 diabetes, with poor glycemic control. He presented in critical condition with a clinical picture consistent of moderate diabetic ketoacidosis… and moderate dehydration.

15

….

Diabetes ketoacidosis is a hyperglycemic crises (sic) consistent with lack of insulin. It can result in several complications, including: hyperosmolality, dehydration, hypokalemia, hypophosphatemia, hypoglycemia, VTE, cerebral edema, coma and death. His presentation is suspected to be related to inadequate supervision, missed doses. Management recommendation is outlined below.

We have discussed with the family that [Tim] was in serious condition, and diabetes acidosis carries significant risk of electrolyte abnormalities, cerebral edema and death. Ongoing parental supervision is critical to achieving good glycemic control in children and adolescents and preventing life-threatening complications of diabetes.

Underlying cause for admission related to diabetes is thought to be due to missed insulin doses/inadequate supervision. Areas identified for improvement includes: supervising all doses, taking insulin for all carb meals and snacks, site rotation.

[Tim] and his family will receive assessment by our multidisciplinary diabetes team during the admission to identify barriers of diabetes care, and ensure safe discharge and home care.

….

Will switch to Lyumjev insulin upon discharge.

Family does not want to continue OP5 upon discharge. They are to follow-up with primary endo about switching back to Tandem pump.

….

Before being discharged by the hospital, Tim was also seen by Staci Grant, PsyD, for a Psychology Diagnostic Interview on June 26, 2024. Her narrative states,

Mother provided information surrounding recent admission. [Tim] was reportedly admitted yesterday afternoon after he woke up and reported feeling weak. Mother called EMS for higher level of care and, due to

16

high blood glucose levels, he was taken to TCH ER. Mother reported that she believes this instance of DKA was due to possible "pod malfunction," as she and [Tim] have had difficulty managing his glucometer and pump for the past few months. She noted that she believes he is experiencing diabetes burnout, given he has been more "forgetful" and "lazy," and has been sneaking food at nighttime while playing video games. She shared that he was initially diagnosed at 17 months of age and has been admitted for DKA approximately 2 to 3 times. She recognizes that he appears more distressed currently and feels as if he needs to "push through." As provider spoke with mother, [Tim] briefly mentioned he is "not burned out" and "does not want to do therapy." Feels "interrogated" in meeting with several providers

**Previous Evaluation/Intervention:**
According to [Tim's] caregiver, he has previously participated in evaluation and/or intervention including family therapy, individual therapy, and trauma services. Per mother, [Tim] has received multiple services throughout his lifetime and had difficulty recalling dates and names of providers. She noted that he was recently in foster care in 2022 and, as a result of physical abuse, he received trauma-informed care. Additionally, he participated in occupational therapy in 2023. Per mother's report, she does not believe he has had a good experience with individual therapy, as he continually states that he "does not want to talk" and "feels forced" to participate. He has not received services to address diabetes management and care; however, mother believes a mentor and/or support groups would be more helpful. No official diagnoses

Despite being evaluated on multiple occasions in the past, he has not received any official diagnoses and has been told to address prior trauma.

….

Current Diagnosis: F43.20 Adjustment Disorder, Unspecified
F90.2 Attention Deficit Hyperactivity Disorder, Combined (By history)

**Recommendations/Plan:**

1. Psychology follow-up is warranted and suggested at this time; however, patient refused. Mother was informed about possible reasons to request additional Psychology services should [Tim] be open to support in the near future. She is welcome to ask their provider or call Psychology directly… should they like another appointment.

2. Briefly discussed relationship between health and mood, highlighting impact of trauma and stressors on ability to participate effectively in management of health.

3. Encouraged mother to increase supervision of diabetes care daily and to schedule times for [Tim] to participate in gaming following participation in glucose checks and insulin administration.

Referred to Psychiatry? no

**September 8, 2024**

Tim woke up with a blood glucose level over 500. Tim was transported by EMS to the emergency department at TCH The Woodlands where Tim informed the staff that when he woke up, he found that his omnipod had expired. According to the records, Tim was examined by Nancy Shan, MD, who reported Tim was "not in DKA." Nevertheless, Tim was admitted to the hospital with a nurse's admission note that indicates, "Patient received from EC with diagnosis of DKA." He was "accompanied by older brother [Trevor], [who] claims he is 20 yo and another sibling, 10 yo. [Trevor] claims he is the guardian, and signed consent and other documents at EC for admission[.]" The nurse's notes indicate,

> Received an outside call…claims to be mother of patient. Told her Im (sic) am not able to give information since I have not met her and she does not have the code. She wanted to speak to the doctor ASAP

18

because she said did not give consent for her son to be admitted. She said her son is not in diabetes ketoacidosis, and that she can manage this at home. Claims that the patient's pump just malfunctioned last night. Mother said that she wants her son discharged[.]

Dr. Shan's narrative indicates,

[M]other not at bedside, older brother signed consent in ED to admit Patient. MD spoke to mother over phone with bedside RN present. Mother angry and belligerent on phone, stating that she did not want her child to be admitted as he is not in DKA and she can take care of his diabetes at home. Agreed with mother that yes, patient is not in DKA however his glucose and ketones were very elevated, and he required IVF and frequent insulin injections to prevent him from progressing into DKA. Updated mother that patient's labs are improving but he has not yet met Endocrine criteria for discharge. Any premature leaving the hospital would be against medical advice. Mother stated that "Woodlands is stupid, they don't know what they are doing, they are harming my child" and that she will sue the hospital. She also stated that if patient is not discharged home with older brother and she came to the hospital, it will be a "big deal". Security aware of mother's statements[.]

The hospital's Discharge Summary states,

Mother arrived to bedside and refused to let RN given insulin for dinner carb coverage. [Social Worker] was notified and arrived outside patient room. As charge RN and MD were going to bedside, received notification from bedside RN that mother had removed patient's PIV herself and left the hospital with him. MD had spoken to mother earlier on the phone and told mother that leaving the hospital before meeting Endocrine criteria for discharge would be against medical advise (sic). Patient arrived to hospital without insulin pump in place, and uncertain if/when new pump will be placed. He was not covered for his dinner carbs and he is in danger of worsening ketosis and hyperglycemia. Mother left with patient against medical advice. MD recommends CPS being called and patient brought back to ED for continued medical management. [Social Worker] aware.

19

**October 9, 2024**

Tim was transported by EMS to TCH The Woodlands for a "Behavioral

Problem[.]" According to the emergency department's records,

> Patient reports he gets angry sometimes. Reports he got mad at his
> brother today and "said some things he didn't mean", and got into a
> fight. Patient admits that he takes care of his diabetes, and monitors his
> blood sugar with the help of his mother. Mom reports family recently
> homeless, after moving out of a "questionable" hotel. Mom reports she
> was recently awarded her financial benefits from death of family
> member. Today family was at a motorcycle shop looking at dirt bikes,
> and having a mechanic look at younger siblings dirt bike for repair.
> Mom reports patient got upset, and started a fight with brother. In the
> midst of fighting patient was heard saying "I want to kill everyone, and
> then kill myself". Patient has history of anger, and aggression. Mom
> reports she believes he would do it, do (sic) to his past history. Mom
> reports patient has had outside counseling, and psychiatry, however,
> due to their current financial situation, he has not been going. Patient
> unwilling to go into detail about what happened today, or how he feels,
> but denies current SI/HI, auditory or visual hallucinations. In no acute
> distress.

Tim was admitted to the hospital and on October 10, 2024, a Diabetes Consult

was conducted by Dr. McCann-Crosby, whose narrative indicates,

> He was noted to have hyperglycemia with ketosis in the EC.

> He is on an Omnipod pump but does not have a Dexcom currently and
> has been in manual mode. Per mom he has not been checking his blood
> sugars. He manages a lot of his diabetes on his own but does get some
> help from his mother.

> Mom reports that they are currently homeless. They were living in an
> extended stay, however mom was concerned about sex trafficking
> around the extended stay so they left and have been living in their car.
> Mom reports that she has 2 pit bulls and it has been difficult for her to
> find a place to rent that will accept the pit bulls… When asked about

20

the insulin storage, mom reports that it has not been kept consistently in a refrigerator recently…Yesterday [Tim] became upset and threatened to kill mom and his brother and then kill himself. Mom called EMS and they brought him to TCH The Woodlands.

Mom was very upset this morning because she was initially told by the front desk on the 5th floor that they didn't have record of [Tim] in the system. She reports that [Tim] has been listed under different names during several previous hospitalizations at TCH and she has had difficulty being able to see him during his admissions because "they can't find him in the system". She does not want to be admitted to TCH Woodlands in the future because of these concerns. Mom mentioned multiple times that she wants to take [Tim] and leave AMA. She reports that if CPS is called again she will not answer her phone if they call her.

….

His presentation is to (sic) suspected to be related to missed insulin doses/inadequate supervision, likely bad insulin due to lack of refrigeration [].

We have discussed with the family that Tim was in serious condition, and ketosis could result in acidosis/DKA and significant risk of electrolyte abnormalities, cerebral edema, and death. Ongoing parental supervision is critical to achieving good glycemic control in children and adolescents and preventing life-threatening complications of diabetes.

Of note, the family is currently homeless and patient is not in school currently. [Social Worker] has met with the family and a new CPS case has been opened today. It is recommended that he be admitted to inpatient psych.
He is medically cleared from an endocrine standpoint.

Erlene Norris, LMSW, conducted a Social Work Psychological Assessment,

which indicates,

Per mother, she brought pt after he became agitated and got into a physical fight with his younger brother. According to mother, pt

21

became really upset and threatened to Kill himself and his mother and brother.

Pt was previously diagnosed with ODD, ADHD and adjustment disorder. Per mother pt is not receiving treatment or taking any medication. Mother revealed the family is going through a crisis and are currently homeless.

Mother also disclosed they have not been able to go to their endocrine appointments due to their crisis. Sw asked mother to tell her more about her crisis. Mother explained they were leaving (sic) at an apartment and had to leave that apartment and they left the medicines and everything behind. Mother disclosed they have been staying at 'sketchy" hotels.

….

[Social Worker] discussed with mother next steps including recommendation for inpatient treatment. Mother reporting she was in agreement as long as she could be at bedside. Mother identified Kingwood Pines as facility of choice.

Four hours later, when an ambulance arrived to transport Tim to Kingwood Pines, Mother refused to sign the authorization. The nurse's notes indicate Mother "[s]tated she will not allow for patient to be transferred to any hospital associated with TCH. Mother voiced frustration with our hospital contacting CPS. House Supervisor, Charge nurse, security at bedside to attempt to de-escalate situation to no avail. Mother walked patient out of unit. Mother refused to sign AMA paperwork."

Months later, during Mother's Psychological Evaluation with Jenny Stadler, Ph.D., in January 2025, Mother recalled:

22

I was homeless; I was asking for help and I wasn't getting any help; my children were acting out… My kids don't deserve this; there is no medical neglect; I had reasons to leave the hospital; [Tim] was having outbursts; he was trying to hurt me or his brother; I called 9-1-1 and took him to the hospital; I want to say he went by EMS; I wanted treatment for him; evaluate, psychologically; he's had the same thing at this hospital before; I wasn't able to be there; I met a friend to take [Chris]; [Trevor] was able to get to the hospital at first; they're saying I can't go back through the doors; they're saying he's not in the system; I get there, and he's under 'Thomas'; the security guard had to call another person; I ended up walking back there; I'm there thirty minutes; my child is back there by himself; I'm not a threat to anyone; y'all aren't doing what you needed to do to check him in properly… What made me upset; it wasn't that I was against CPS; when they told me what they were saying; I didn't want that facility to treat my child; they were saying I probably didn't have insulin for my son…I have left the hospital previously for an incident; I am my son's advocate if things aren't done properly; I wasn't yelling, screaming, cussing.

**October 14, 2024**

The medical records reveal an endocrinology appointment at TCH was made on October 14, 2024, and when the appointment was missed, a social worker notified CPS worker, Aaron Stocks.

**Trial Testimony**

The foregoing medical history brings us to the events that led to the Departments' filing an action to terminate Mother's parental rights, and the progress, or lack thereof, toward reunification of the family prior to trial. For a description of those events, we rely on the trial testimony and records.

**Aaron Stocks**

Stocks testified that he has been an investigator with the Department for four years. In early October 2024, Stocks received an intake regarding Mother. He explained that the Department received an allegation that Mother, Tim, Chris and two pit bulls were living out of a truck and that Tim, who is diabetic and having a mental health breakdown, was admitted to the hospital with glucose "numbers off of the charts[.]" According to Stocks, Mother had a history of disregarding medical advice and was potentially going against a doctor's recommendation to place Tim in an inpatient treatment center and wanting to discharge him.

Stocks went to the hospital to interview Mother and Tim. Stocks arrived at the hospital and observed Mother leaving the hospital. The nurse confirmed that Mother left, and she did not know when she would come back. Stocks waited 45 minutes for her to return to the hospital. Upon Mother's return, Mother did not want to talk to him and attempted to leave as soon as she noticed him. Stocks calmed Mother, and they spoke for an hour. Mother told Stocks that the family was living out of her truck and occasionally in hotel rooms and with friends. She said that she had a cooler for insulin storage, and that she "periodically" missed some of Tim's appointments because of problems with her vehicle. She discussed Tim's mental health, telling Stocks that Tim "had a breakdown." Stocks testified, "I believe he had pulled a knife on his brother[,] and she felt that it was necessary for him to go to the hospital."

24

Tim was not transferred to inpatient treatment, and after several attempts to follow up with Mother and meet Chris, Mother stopped answering Stocks's phone calls. Stocks testified that he did receive a call from Mother in which he "answered the phone and I heard screaming and dogs barking and calling for help from [Mother] from afar. So[,] it sounded like it was like a pocket phone call." After Mother stopped responding, and because Stocks had not had an opportunity to observe Chris, he issued a "CSCAL. It's -- I always explain it as like an Amber Alert for children in the state of Texas. So anytime that we have unseen children, there's an alert that goes in with law enforcement in case there's any contact with the parents. It alerts that [the Department] is in need to see the children."

Stocks classified Mother's case as "reason to believe" because of "[m]edical neglect, neglectful supervision, and . . . refusal [of] parental responsibility." According to Stocks, Mother medically neglected Tim because she "withdrew her child from the hospital against medical advice[,] [and] missed the next medical appointment[,]" and committed neglectful supervision because she tested positive for methamphetamines. According to Stocks, someone reported that the reporter had smoked methamphetamine with Mother between the time Stocks contacted Mother and the reporter's contacting the Department. He also testified that Mother refused to accept parental responsibility by calling the "cops and said to come pick up her children. She didn't want them anymore."

25

**Christopher Sheffield**

Sheffield is a sergeant with the Montgomery County Sheriff's Office. On October 26, 2024, around 1:30 a.m., Sheffield was dispatched to a call involving Mother and her two children after being told that pepper spray had been sprayed in a vehicle affecting several people. When he arrived, Sheffield located Mother in a black pickup truck in a driveway of a home, and her two children standing in the street near the driveway. Mother told Sheffield that Tim was "physically [and] verbally abusive to her[,]" that he was cunning and deceptive, and blamed her son for the family's being homeless. Mother reported that Tim threatened her with pepper spray but that he had not actually sprayed the pepper spray. Mother told Sheffield that the Department had been involved with the family, and at one point, Mother asked that the Department come and get her children that night. Sheffield described Mother's appearance as "common in people that use stimulant-type narcotics or drugs[,]" and that Mother was "acting very fidgety" and "did not seem of normal…sound mind to me." Mother told Sheffield that she wanted someone to take her kids because she was "at her wits' end with them," and Sheffield "was trying to help her defuse the situation." Sheffield was unsuccessful in finding anyone to take the children. He described the boys as "well-fed[,]…very rambunctious, like normal boys are. But . . . concerned about the situation as well. They understood that they were homeless and it -- they seemed to be emotionally affected by it." Sheffield

26

identified an exhibit that demonstrated Mother tested positive for methamphetamines three days after he responded to the call.

**Jefferson Rampy**

Rampy is a paramedic with the Montgomery County Hospital District. He was dispatched to the 911 call on October 26, 2024. Rampy testified he was called to the scene because of "concerns about the health of one of the children in question and . . . they called us for evaluation." According to Rampy, Tim is diabetic and when his blood sugar was taken that night, his glucose level was 487. Rampy testified that normal glucose levels are considered 80 through 120. He testified that Tim's blood sugar needs to be regulated with insulin and that Mother told him she had insulin, but the insulin was not refrigerated. According to Rampy the lack of refrigeration would have "accelerate[d] the deterioration of the insulin[,]" but even if the insulin "was kept at room temperature, it would have still been effective." Rampy testified that Mother told him that "[t]hey had insulin in their possession. We noted that it was not refrigerated, and she said that it had been unrefrigerated for less than 28 days, which is important because that's -- that's the limit for how long insulin can be unrefrigerated." Ultimately, Rampy did not "know whether the insulin was going bad or not. All I know is she told me it had been unrefrigerated for less than 28 days. So if that's true and it was kept at room temperature, it would have still been effective. I don't know. I did not pursue the veracity or try to tease that out." Rampy

27

stated Tim's glucose levels caused "acute concerns" because it "can affect their mentation in the long -- in much longer terms, it can have significant detrimental effects later in life if their blood sugar is not kept under control consistently." Based on his training, Rampy stated that a child with glucose levels that high should be transported to the hospital. According to Rampy, Chris did not have any notable health issues.

**Daniela Hernandez**

Daniela Hernandez testified that she is an investigator with the Department. Hernandez stated that on October 26, 2024, while Stocks was investigating the case, she "received an additional referral for an immediate assist while I was on call - - over the weekend." According to Hernandez, the Department received a report that "[Mother] did not want the children in her care and wanted [the Department] to take the children." Hernandez responded to a home located in Magnolia at 4:30 in the morning. When she arrived, she found Mother asleep in a black truck. It took "about an hour[,]" to wake Mother after they arrived. The children were not with Mother, but in an RV on the property belonging to Mother's adult son. When Mother awoke, she appeared "not totally coherent or lucid[]" with "super slow[]" speech and Hernandez did not believe that she understood the questions being asked.

Hernandez testified that she spoke to Mother for "[a] few hours[]" that morning. Mother denied calling the Department to take her children but stated that

28

she called law enforcement because Tim "was attempting to mace her or somebody else." Mother told Hernandez that the police were "lying against her and making false accusations against her." Mother denied all drug use. Mother did not want the Department to take her children. Mother showed Hernandez Tim's insulin, but Hernandez testified "it was kind of unclear whether he was actually getting his insulin or not." Mother discussed Tim's mental health and that Mother believed Tim would "kill someone." Mother told Hernandez he was seeing a pediatrician and getting "in some sort of outside program," but the information she provided was not clear to Hernandez. Mother agreed to have Tim transported to a medical facility for evaluation but refused to send him to Texas Children's because they had "repeatedly made false accusations against her, and she was filing a grievance against them." During their discussions, Hernandez testified that Mother would become "really mad at me and start yelling at me," and that "[she] wasn't really being cooperative." The children were removed that day and placed with fictive kin. Hernandez detailed the Department's concerns including Tim's medical and mental health, Mother's substance use, and whether the Department would have continued access to the children to check their safety and well-being if they were allowed to stay in Mother's care. Audio was played in which Mother could be heard saying "I want [the Department] to take these kids. I can't deal with this anymore." Hernandez testified

that Mother refused the option of a "safety plan" and told Hernandez that she was not going to "do anything without a court order."

Medical records from October 26, 2024, indicate Tim's clinical picture was "consistent [with] hyperglycemia with ketosis and mild dehydration which resolved with IV fluids and insulin in EC," but he was "not in DKA." Huda Adnan, LMSW, a social worker familiar with Tim, was consulted. Her assessment was, "At this time, pt is here for medical clearance prior to discharge with new placement/caregivers. Pt is not presenting with psychiatric complaint nor does he require a mental health assessment. Provider confirm[s] that plan is to DC patient per CPS disposition. No inpatient psychiatric hospitalization is warranted on this visit."

**Casandra Duran**

Casandra Duran testified that she is a conservatorship worker with the Department. Duran did not describe her educational background or her experience with the Department, and the record does not indicate that she has any "knowledge, skill, experience, training, or education" that would enable her to express expert opinions. *See* Tex. R. Evid. 702. Duran stated that she has been the conservatorship worker on this case since the children were initially removed from Mother in October 2024. Initially, Chris was placed with his maternal grandmother and Tim was placed with a cousin, but due to behavioral issues at school, Tim was removed from his

30

cousin's home and placed with "Hailey," who had been Father's fiancée before he passed away.

Duran noted the family had supervised visitations on Saturdays and that sometimes the boys would physically fight at the visitation. According to Duran, Mother would pull out her phone and record before helping to break it up, which Duran said was not helpful. On cross-examination, Duran conceded this happened only one time, in June or July 2025, before the boys were placed back with Mother in July 2025.

Tim and Chris were placed back with Mother from the end of July 2025 to the middle of August 2025. Duran recalled that she advocated for Mother to have the monitored return with her children. Prior to the children's being placed with Mother for the monitored return, Mother completed services such as counseling and had negative drug tests. Duran agreed that at the time of trial Mother had completed all her services under the family service plan, except for individual counseling sessions. Duran stated that the Department did have "concerns" after placing the children in a monitored return, noting the siblings' fighting, the Department's history with the family and whether "the support was going to be there."

On August 11, Duran received notice that there was an "incident" with Tim. Mother told Duran that while they were driving home the day before, Tim got upset and started hitting her. When they arrived home, Tim climbed onto the roof of her

home, and she called law enforcement to intervene. Tim was then taken to the hospital and discharged at 6 a.m. the next morning. At 5 p.m. that same day, Duran received another call from Mother that Tim was destroying property at Mother's home and Duran could hear Tim in the background "screaming, yelling, grabbing at [Mother's] phone." Mother hung up the phone, called Duran back, and asked if Tim could go back with Hailey. Duran heard Tim in the background saying, "I don't want to go." Mother told Duran "I can't do this. I can't do this." Duran asked what was needed to calm Tim and sent food to Mother's home for Tim. Tim eventually calmed down.

The following Wednesday, Mother called Duran at 8 a.m. stating the boys were being "disrespectful[,]" and did not want to "get up." According to Duran, Mother said "she was just basically saying that it was not fair that we just threw these kids at her. We didn't give her enough time to prep."

On August 18, 2025, Mother contacted Duran and told her that Tim had another episode and that she took him to the hospital for his glucose levels and eventually admitted him into a "psych facility." Duran testified Tim was placed back with Hailey after he was discharged from UT Health inpatient psychiatric care on August 28, 2025. The Department was "concerned" about Tim's diabetes and Mother's ability to handle both boys. Duran agreed the Department was "at a loss on how to fix this[,]" so Tim was not returned to Mother's care, and the Department

32

allowed her unsupervised visits. The first visit was on September 13, 2025, and according to Duran, Mother did not say anything happened during that visit, but for reasons that were not explained at trial, Duran and her supervisor decided Mother would have supervised visitations from that point forward.[5] The first supervised visitation was on September 24, at Mother's new home. Duran agreed there was "nothing inappropriate about [Mother's] new home." Everything went fine until the end of the visit when Tim asked to take a phone Mother had given him to Hailey's home, and Duran said, "'No, we already had a discussion about this. We -- you know, if [Hailey] wants to get you the phone, she'll get you the phone.' And it kept going at it for about like 20, 30 minutes." According to Duran, Mother told Tim, "'Go ahead and take the phone[,]' [a]nd I told her directly, I said, 'No. He's not allowed to take the phone.'" During the next visit, on October 8, 2025, everything was going well until Chris told Mother and Duran that Tim slapped him in the face. Duran testified that Mother then went inside the home to talk to Tim, and although Duran tried to keep Chris outside, he followed Mother into the home. Tim then punched Chris in the face, and although Duran was attempting to stop it by putting her hand in the way, Tim "just, like, flung my arm." Duran testified that she has never seen Tim act this way outside of Mother's presence. Duran conceded Tim has

---

[5]When questioned about why the visits were changed from unsupervised to supervised, Duran agreed it was not because of anything Mother said or did wrong, and Duran was not aware of any abuse or neglect during that time.

33

told her to "shut up" a few times but has not been physical with her. Duran testified the Department believes it is not safe for the boys to be together and has "concerns" about Tim's medical needs if he were to be returned to Mother. She testified this belief was based on "[t]he medical records that we have. All the Against Medical Advice, leaving Against Medical Advice." Duran testified that she believes it is in Tim's best interest to be with his current caregiver, because Tim has "stability[,]" his diabetes is properly managed, and he is doing really well at school and in her home.

Duran listed the steps Mother had been required to take under the family service plan, including psychological assessment, parenting classes, domestic violence classes, providing a home, allowing CPS to see the home, and getting a job. Duran agreed Mother was compliant with all the services and performed them to the best of her abilities. Duran explained that Tim was not returned to Mother upon discharge from UT Health inpatient psychiatric care because of "[s]afety matters. With [Tim] pulling out a knife on [Mother] and him being sent to a psych hospital for aggressive behavior and him not having these behaviors while he was with his caregiver, it was in the best interest for [Tim] to be placed back with his previous caregiver for respite." Duran testified that Tim does not have these behaviors with his current caregiver. She conceded, however, that Tim has pushed Hailey on one occasion.

According to Duran, Mother cannot handle Tim's behavior and is not fit to care for both children. Duran testified that she does not believe Tim is safe in Mother's home and recalled an event while Tim was hospitalized in August between Chris and Mother. "The day when I went to [Mother's] home, she stated that [Chris] had gotten on top of her, was punching her, hitting her, had grabbed the broomstick and was chasing her outside. She had to get on top of the car to get him to stop. He was punching the walls. He had grabbed a knife. He was playing with the knives." Based on that incident, Duran agreed that "it's a danger for [Tim] to go home in that situation."

Duran explained why Chris was returned to Mother and the Department nonsuited its case with respect to Chris. According to Duran, the Department does not object to Chris's being with Mother and has made visits to Mother's home and determined that Chris was not being abused or neglected and that Mother was fit to care for Chris. "It's not that we're comfortable – fully comfortable. It's the fact that we don't have another option for [Chris] at this moment. He's physically okay with [Mother] but we did not have -- we did think about removing him as well. [W]e did not have another option." Duran testified that although there was an episode with Chris in August, the Department chose to leave him with Mother because he is physically safe with her. "[W]e don't have any family members for [Chris] and then, eventually, it would be either Child Without Placement which is they usually go to

a hotel, CWOP, or until we find placement for him at an RTC, something and his level of care is intense or he stays with Mom. Physically, he's okay with Mom." She explained that it is not the same with Tim and that his behavior and medical diagnosis is a concern. "[Tim] escalates to the top where he -- if -- it's really severe. Like, [Tim] really does escalate. [Chris] can calm down eventually faster than [Tim], but [Chris] hasn't had so many incidents like [Tim]."

On cross-examination, Duran conceded, however, that Chris threw a pen at her on one occasion, explaining, "I'm trying to calm him down. So, of course, you know, you're trying to redirect these kids, and they're going to attack when somebody is trying to redirect them." Duran testified Mother was also trying to redirect the boys on that occasion.

Duran was also asked several questions on cross-examination specifically about a "continuing danger." Her testimony was as follows:

> Q.     So what is it about my client as of today, snapshot, that would indicate that she is a continuing danger to this child?
>
> A.     She is not able to handle the behavior when he gets to the point where he's being very aggressive.
>
> Q.     So who's the dangerous one? Is it my client, or is it [Tim]?
>
> A.     [Tim]. But what is provoking [Tim]?
>
> . . .
>
> Q.     So your testimony today as to continuing danger is primarily due to [Tim] acting out, making these threats against my client, correct?

36

A.    Correct.

. . .

Q.    What would alleviate your concerns to allow [Tim] to be back home with my client if he was to be returned home?

A.    To be honest, I can't say because I feel like I -- it's a lot of concerns at this point with his diabetic -- his diabetes needs, his behavioral needs. I can't give you just exactly one reason, like –

Q.    Well, so far you've named his diabetes and his behavior. What else is there?

A.    I mean, it's just what's triggering him in the home.

**Mother**

Mother testified that she has two minor children, Tim and Chris.[6] She divorced their father in 2016, and he died in 2018. Mother now receives social security benefits of around $5,400 per month for her children and herself. Mother testified she was not employed in the summer of 2024 because she was a "stay-at-home mom[,]"but she now works "part-time at Pizza Hut." Mother confirmed that she is on probation for aggravated assault.[7]

Mother testified she used methamphetamines for the first time in 2024. The Department admitted an exhibit that showed Mother tested positive for

---

[6]Mother also has an adult son, Trevor.
[7]During her case-related psychological evaluation, Mother told Jenny Stadler, PhD, that "this guy attacked and started strangling my oldest son; I ended up hitting him with this tire tool; I basically almost killed this guy[.]"

methamphetamine in 2020, and a psychological report in which Mother admitted using methamphetamines around age 19 and 20 yet she continued to deny any drug use before 2024. Mother stated that she bought a pill from someone in 2024 and did not know it was methamphetamine. Mother testified that she attended substance classes during the pendency of this case, and that she learned "I would not buy anything off the street ever again thinking it's Adderall or my medication." According to Mother, after testing positive for methamphetamine in October 2024, she was tested several times throughout this case, and she has never tested positive again.

Mother initially testified that she has removed Tim from the hospital against medical advice only twice. Mother stated that each time, Tim was listed under a different name at the hospital, but she could not explain why a different name was used. Mother agreed that Tim's diabetes diagnosis is a "life-threating[]" condition but could not recall how many times she left the hospital against medical advice when Tim had been hospitalized due to diabetic ketoacidosis. The Department introduced exhibits containing excerpts from the medical records and used them to question Mother about removing Tim from hospitals against medical advice in December 2018, June 2019, June 2020, July 2021, June 2023, September 2024 and October 2024, but Mother could not recall all of the incidents. According to Mother, each time she removed Tim from medical care, she subsequently took him to another

38

facility for a second opinion. "[T]here's been numerous times I have left and I have followed up with either endocrine or his primary care physician[.]" Mother also testified, "And he's always been okay after I left."

Mother stated that Tim has attended eleven schools. She testified, "I believe that I did what was best for [Tim] due to his behavioral issues as well as his learning disability. I had to find the appropriate school for him[.]"

Mother testified regarding an incident in May 2024 in which she flagged down a passerby to call 911 while they were waiting at a red light. Mother recalled that Tim ran away into the woods when he found out law enforcement and EMS were responding to the call. Mother testified that she felt there were times it was necessary to call 911 and seek help from law enforcement because Tim was a danger to himself or his family.

After Tim was removed from her care, Mother had visitations with Tim in which she noticed injuries to Tim. Mother testified she notified the Department, and she did not receive an explanation from either Tim's caregiver or the Department. Pictures of the injuries were admitted at trial. She thought that the Department would help her and the family with counselling and additional services, but she had to seek counseling on her own for herself and her children. She admitted, however, that the Department did provide information for counseling services and that Medicaid is paying for the counseling.

39

Mother was provided with a service plan, and part of the plan was for Mother to be drug tested frequently, complete a domestic violence course and become employed. She testified she makes between $1500 and $1800 per month working at Pizza Hut, in addition to Social Security survivor benefits. Mother testified that she had recently moved into a new home with Chris. Photographs of the home were admitted into evidence. Mother stated that she has completed the services that were required except for individual counseling, because she was not reimbursed by the Department for the cost.

Mother agreed that "at the last hearing, the Department recommended the children be returned home to [her]." She testified that after the court authorized the children to be returned home in July 2025, they were doing well in her home, but in August she sought help for Tim, and he was hospitalized for a mental evaluation. According to Mother, Tim had climbed onto the roof and was threatening to touch powerlines. Tim was then handcuffed and placed in the back of a police car. Tim was placed in the hospital, then released. Tim was hospitalized a second time in August 2025, because he pulled a knife on Mother. Mother testified Tim and Chris did not want to go to bed, and when she told Chris to get off the computer, Chris obeyed, but Tim went into the room and got on the computer, so Mother unplugged it, took the power cord and sat down on the couch. Tim then grabbed a knife, and

Mother "told him to put the knife down and he refused[,]" so Mother "took immediate action by calling 911."

Mother testified she called the Department for help after the children were placed back in her care in August, but she denied saying the Department "threw" the kids back to her; instead, she recalled expressing "concerns about them not receiving adequate counseling and therapy….And I thought that it was very unfair that I'm trying to look for resources to help them stabilize their mental health and I had no resource." Mother testified that she requested Tim be admitted to inpatient care, for "[m]edication management." Mother described the different medications that had been prescribed for Tim in the past and stated that she was following medical advice.

Mother testified that while Tim was hospitalized, she had to call 911 for Chris because he hit her in the head with a broom and then grabbed a knife. According to Mother, Chris "was very angry. He was having a mental breakdown. He hadn't -- he -- I remember taking him to the hospital. He was denied -- like, he could not see his brother. He told me it was my fault that [Tim] got ripped away, that I shouldn't never called the police and he started stabbing the bed and just putting holes in the walls." When Mother was asked whether she made sure to hide the knives, Mother testified, "I don't even have any kitchen knives anymore."

Mother testified that when Tim was removed in August 2025, she was told it was a "respite[,]" or "[a] break…just a cooldown time[,]" but Tim was not returned

to her care. Mother testified that since Tim was released, the Department has not provided any help and has not made any efforts to reunite Tim with Mother and Chris. According to Mother, she understood the family service plan to outline the actions that were necessary to obtain the return of her children, she did everything she could to the best of her abilities, she has a safe and stable home, and Chris has been returned to her care, but the Department did not keep their end of the bargain.

**Hailey**

Hailey testified that she was in a relationship and engaged to Father when he died in 2018. Hailey testified that while she and Father were together, the boys would come over to their house, but she did not have contact with the children after Father died. She learned that the children were placed with the Department in October 2024, and Tim was placed with her. Chris was placed with his maternal grandmother. Tim was with Hailey from January 2025 to July 2025 when he was placed in a monitored return with Mother. After Tim was released from the hospital in August 2025, he was again placed in Hailey's home. Hailey testified she had no reservations about having Tim in her home and that she would be willing to take permanent conservatorship or adopt him "[i]f it was necessary[.]" She testified that she has not had any "significant" behavioral issues with Tim, noting his behavior was "[n]othing that a 13-year-old boy wouldn't be doing." She testified that he has not been hospitalized while in her care. In regard to injuries noted by Mother, Hailey stated

that Tim fell off his bike and got road rash, though she did not know how the other injuries originated, explaining she had never seen any other injuries. When Hailey testified on Monday, November 3, 2025, Tim had just completed behavioral classes the previous Friday and was just then returning to regular classes at school. Hailey testified that she has no concerns about his grades, and that his recent report card was good. Hailey stated that she does not believe Tim is difficult to care for or that he is violent. Hailey described her disciplinary methods in a situation where Tim was argumentative or a "little physical[,]" because he wanted candy, stating she would walk out of the situation to allow him to calm down, and later he returned the candy to her and apologized. Other times she takes away electronic devices or grounds him. Hailey testified that she would not want Chris in her home at this time because of "the way the boys get when they're together, it's very physical, trying to 'cause, like, immediate harm to each other[,]" but she is not opposed to supervised visitations between the siblings. She believed it was in the best interest of the children for them to be kept apart. Hailey testified that Tim's behavior "varies on the day" after visitation with Mother. After the last visit Tim came back "irritated."

**Ingram Lee**

Ingram Lee testified that he is the guardian ad litem and CASA advocate in this case, and he and his partner, Sholly Walker, have been involved with the case and the children since the beginning. Lee did not describe his educational

background or his experience as a guardian ad litem or CASA advocate, and the record does not indicate that he has any "knowledge, skill, experience, training, or education" that would enable him to express expert opinions. *See* Tex. R. Evid. 702. And although lay witnesses are allowed to express opinions that are "rationally based on the witness's perception[,]" Lee did not describe any interactions with Tim nor any observations of Tim while in Mother's care; he testified only about observing Tim, "hear[ing] of his behavior[,]" and seeing his report card and progress reports, during the time Tim was in Hailey's care. Nevertheless, without objection, Lee opined that he has concerns for Mother's parenting:

> I'm specifically concerned about her ability to manage [Tim] and [Tim] with his brother. I'm concerned about [Tim's] physical health. Specifically, have to do with his – the management of his diabetes, his physical danger, the potential for that being in the -- if he's returned home. And I base that on the fighting between him and his brother. I look at [Chris's] violence towards his mother. I'm concerned about his emotional needs based on the fighting between the boys and her parenting ability, her ability to manage the two, and I'm concerned about his educational[,] [including] [t]he prior attendance, prior to coming into [the Department's] care, the number of schools that [Tim] has attended.

Lee testified that he believes there is continuing danger for Tim in Mother's home:

> I see the management of his diabetes as being primary. I base that on the prior issues that he's had with -- with [Mother] has had with the – the management of the diabetes. I also base that on the physical violence between the two. And two – … Between the two brothers and, also, the violence of [Chris] with respect to his mother, that that would not be a safe environment for [Tim] to be returned to.

44

At the beginning of the case, Lee did not believe the children should be separated, but he changed his mind after they were sent to Mother for the monitored return. He now recommends the boys not be placed together. Lee testified that he has no concerns regarding Tim's placement with Hailey. According to Lee, Tim is doing well in school, has good behavior, and enjoys being with Hailey. Lee stated that Mother's conduct caused Tim to be removed from her care in August, testifying she "[f]ailed to properly monitor the boys and separate them and remove the fighting that was taking place." But he noted that calling law enforcement for help and hospitalizing Tim "was a good thing to do." Lee stated that his concern is that the behavioral issues got to the point of calling 911. Lee believed termination of Mother's rights would be in Tim's best interest.

**Sholly Walker**

Sholly Walker stated she is the other guardian ad litem and CASA advocate on this case. Like Lee, Walker did not describe her educational background or experience. She did not indicate that she has any "knowledge, skill, experience, training, or education" that would enable her to express expert opinions. *See id*. She testified she had visited the children frequently while they were placed with an aunt three years earlier, and although she agreed that she had "read reports and conduct[ed] an investigation to try to determine the best interest of the children[,]" she did not elaborate on the "reports" nor the "investigation."

45

From the beginning of the case, Walker did not believe the boys should be placed together. Walker testified, "Previously I'd seen in placement, they did not do well together. They had -- they had blown up their placement in the past case."[8] Walker testified, "They were fine when they were separate and then when they both were placed with the aunt, they started -- their behavior just got out of control and they could not handle them." Walker opined that termination of Mother's rights would be in Tim's best interest. She based this opinion on "[b]ehavior, parenting. I just don't see how she can handle both boys together." She also had concerns about Tim's health and Mother's removing Tim from hospitals against medical advice. Walker had no concerns about Hailey or Tim's placement with her. Walker denied being aligned with the Department and testified she is "aligned with the kids' best interest." Walker conceded that she had not observed the brothers together since the beginning of this case, that when she did observe them for this case, they appeared

---

[8]Mother testified the boys were placed in CPS custody in 2021 because Tim "was overdosed by a school district[.]" Records from the Montgomery County Sheriff's Office show that in March 2022, the foster mother called 911 because Tim was "being violent in home" and had to be "restrained by foster mother[.]" According to the foster mother, Tim "started acting out because he wanted her to help with a puzzle, she said no so he pushed the table and pieces went everywhere and he hit his brother[.]" While she was on the phone with 911, Tim was "actively violent" and was "still fighting with her… kicking and trying to break things… arguing [and] threatening to punch her[.]" The foster mother told 911, "if she would let go of him he would run away… last time he ran off and it took them 45 minutes to catch him… there is no reasoning with this 9yo[.]"

to get along and were bonded, and that she never actually observed a physical altercation between the boys.

**Korosh Memar**

Korosh Memar testified that he is Mother's employer and that she has been working for him since June. Memar stated that Mother is "always on time. She always showed up. If we need help, she's always there and she works hard." Memar recalled an incident he witnessed this past summer at Mother's home after the children were returned to her for a monitored return. Mother's car was broken, and Memar was providing transportation to and from work for Mother. That night Memar observed the following:

> So [Mother] had both of -- both of the kids, they were fighting and so on the way home, she sat in the back seat with [Tim] and [Chris] sit[ting] in the front seat. And then they were fighting in the car, too. As soon as we pull up to her house, when they get out the car, they would start fighting and hitting each other[]. And then [Tim] take the -- jumped the roof. Like, he was -- he went on the roof.
>
> . . .
>
> He went to the – there was like a little awning by her door. So he jumped on that. He climbed onto the roof.

Memar called law enforcement because he believed it was dangerous for Tim to be on the roof. An ambulance arrived, and Tim was taken to the hospital. Memar testified that he has no safety concerns about Mother and the boys.

**Dianne Sheldon**

Dianne Sheldon testified that she was Tim's special education teacher in third, fourth, and fifth grade. She described Tim's behaviors when she was his teacher as "very aggressive behaviors, attention-seeking behaviors, avoidance behaviors, depending on situations and what was going on. He was very unpredictable. It took a lot to get to knowing him and being able to figure out where the behavior was originating from in order to help him direct alternative behaviors that could get the results he wanted." Sheldon described an incident when Tim was getting insulin from the school nurse:

> There was an argument between [Tim] and the nurse over how much insulin he should get and the nurse told him what bolus -- I think it was called bolus -- to put in his little machine and based on the experiences I had had, I was concerned with the amount that was going and I felt [Tim] was correct with what he was wanting. But he did what the nurse had requested[,] and I asked him a lot of questions after that and after -- after that, his behavior became very, very aggressive and defiant.

According to Sheldon, anytime Tim's "sugars were off[,]" his behavior would "severely change." Sheldon testified that when Tim's sugars were off, he would become "more aggressive[,]" and his behaviors escalated. "[I]n particular, oppositional defiance behaviors and aggression would change primarily with low sugar with, like, if he had gone low." She also observed Mother with Tim together, and when asked whether she observed anything that would lead her to believe Mother would put Tim in danger, Sheldon responded, "Just the opposite."

48

**Tim**

Tim was thirteen years old at the time of trial. He testified, "I would love to go back with my mom. Like, I love her. I want to be back with her." Tim said that he missed his brother and that "we might fight and argue a little bit, but that's how brothers are going to be." He said that staying with Hailey is "good. I have fun. You know, I go out on the dock. I fish." But given the choice to stay with Hailey or go back to his Mother, he would want to go back with Mother because "I love my mom. She's my mom. She's never not going to be my mom." He testified that he has his diabetes under control and that he believes Mother has a good handle on his diabetes treatment. He testified that if Mother's parental rights were terminated it would have a negative effect on him and that he would be hurt and sad not to be with his family. He does not want to be adopted, he wishes to go back with Mother.

**Trial Exhibits**

The Department introduced forty-five recorded 911 and law-enforcement calls along with transcripts of the 911 calls. The Department also introduced police reports filed in relation to the 911 and law-enforcement calls. The calls included reports from individuals accusing Mother of crimes, and of Mother calling and accusing others of crimes. Relevant to the children are the following calls:

> **February 15, 2019** – Mother reported that Tim was injured while being restrained at school.

**July 9, 2019** – Law enforcement investigated Mother for reported child abuse after a report was filed with the Department. The police report indicated that Mother was using methamphetamines in front of her children, taking her children to a drug house, and current boyfriend was "physically aggressive" with her oldest child, but determined oldest child was aggressor. Children made no outcry of abuse.

**June 9, 2020** – Law enforcement conducted a welfare check on Mother reported by a social worker at Texas Children's Hospital. Tim had been dropped off at the hospital for issues with his diabetes. Mother told the hospital she would be come to the hospital in the morning but had not done so, and the hospital was unable to reach her. Mother told law enforcement, "I have someone on their way to get my son and my phone is disconnected and I just need to pay the bill!" Law enforcement subsequently contacted the Department, and although the Department placed "a hold" on [Tim], Mother was able to leave the hospital without discharge papers.

**April 7, 2022** – Law enforcement was called upon to investigate allegation that Tim was abused while in foster care.

**April 30, 2023** – Mother called law enforcement because of Tim's behavior, including threats against his brother and to harm himself, and requested that Tim be hospitalized due to his behavior. Tim ran away before law enforcement could arrive on the scene.

**June 11, 2023** – Report that Tim and Chris said a man was waving a gun at their home and threatening everyone. Mother had locked herself inside the home. The incident was reported to the Department.

**May 10, 2024** – Call received from passing motorist in Montgomery County. Mother had flagged down motorist for assistance because Tim was becoming "belligerent" while driving to a doctor's appointment for his diabetes. Mother told law enforcement that Tim was attempting to attack her while driving. Tim was placed in handcuffs and put in the backseat of the patrol car and successfully slipped out of his seatbelt several times. Tim was admitted to the hospital on that day.

**October 26, 2024** – Mother called 911 stating she was pepper sprayed by [Tim]. Law enforcement determined no one had been pepper

50

sprayed. Mother reported that Tim is "out of control, violent, and commonly attacks her." Mother told the officer she could not "handle them anymore." The report described Mother as "agitated and she was fidgeting[] [and] [h]er concentration was scattered and erratic." Mother stated she is homeless living with her children and her two dogs in her truck. Children reported they have not been to school in several weeks. The officer noted that both children appeared to have behavioral and attention problems but did not appear assaultive or violent. After attempting to find placement for the children, and reporting to the Department, the report stated that officers could not wake Mother up from the locked front seat of the vehicle and multiple attempts were made to wake her. The officer learned that there is a current investigation with the Department, and the Department has attempted to contact mother for several months.

Other exhibits included EMS records, Tim's school records, drug screen results for Mother that were positive for methamphetamine and marijuana in 2020, several negative drug screens in 2021, 2022, and a drug screen on October 29, 2024, positive for methamphetamine in hair but not in urine. Mother introduced copies of certificates for completing classes on parenting skills, anger management, domestic violence, drug and alcohol awareness, and batterer intervention in December 2024 and January 2025, along with photographs of Mother's home and of the children and Mother together.

A copy of a psychologist report prepared by Dr. Jenny Stadler on February 7, 2025, about Mother was admitted and states:

[Mother] attended two sessions for this evaluation. During the first session she completed the written assessments and a clinical interview. During the second session she completed various assessments of intellectual and neurocognitive functioning. Her demeanor, thought process, and mood were consistent over the two sessions.

51

….

[Mother's] general intellectual functioning was within the Very Low range… However, it should be noted that [Mother] reported a work history that appears to be inconsistent with the level of intellectual functioning that was found in testing. Additionally, this work history would rule out the possibility of a very low level of adaptive functioning. It is possible that a more detailed assessment of intellectual functioning would find more areas of strength. However, there are also concerns that the current assessment may represent a significant decline in functioning for an unknown reason.

….

… [Mother] was found to be severely impaired when faced with distractions. It should be noted that [Mother] reported that she had taken stimulant medication for ADHD on the morning of the evaluation and consequently her functioning should have been optimal. These results support a diagnosis of Attention-Deficit/Hyperactivity Disorder, combined presentation, and these results also suggest that her current medication is not as effective as would be desired… [Mother] was found to have impairments in various executive functions, including cognitive flexibility and reasoning. These impairments in attention, memory, and executive functioning can significantly impact the ability to benefit from services and also can lead to significant difficulty with effective functioning and organization on a daily basis… [I]t is unknown whether these current impairments have been present over a long period of time, or if they represent notable decline in [Mother's] functioning.

….

In regard to ability to parent, [Mother] scored within the range of non-abusive parents on a measure of potential for child abuse, however this result was invalidated clue to a level of defensiveness. [Mother] reported that she experienced physical abuse. She reported that she had used corporal punishment with her children but discontinued this practice as she believed it to be ineffective and counterproductive. Taken together, there is some risk for physical abuse, and this risk

increases if she is unable to maintain abstinence and appropriately manage her medication. Regarding the risk for neglectful parenting, this is related to the risk for relapse. In addition, there is risk related to her impairments in attention, memory, and executive functioning which likely lead (sic) to disorganization and impulsive, and possibly poor, decision-making.

….

The [Department's] goal for this case is Family Reunification with a concurrent goal of Relative Adoption. This evaluation has indicated risk. [Mother] was found to have a number of impairments that can impact her ability to benefit from services. [Mother] expressed care and concern for her children. Her self-reported work history suggests that at one time she had the cognitive resources to develop the skills needed to create a safe, secure, and stable environment for her children. It is possible that remedial services could help her return to that level of functioning, however this is not certain. The following services are recommended to support [Mother's] functioning as a parent, and to help her develop more appropriate coping skills. If [Mother] is able to successfully complete these services and demonstrate the ability to provide a safe, secure, and stable environment for the children, the primary goal may be supported.

The report recommended that Mother develop a medical strategy to help with her ADHD, attend individual and family therapy, substance abuse therapy, and a medical evaluation to rule out a decline in cognitive functioning.

Psychological Reports pertaining to Tim and Chris were also admitted. Dr. Salmeron's report recommended consideration of a number of therapies for Tim, including individual therapy (to develop self-esteem, effective self-expression and adaptive coping skills), individual supportive therapy ("to develop associations between emotions and behavior[,] [t]each how to identify situations that trigger

53

escalation… and to implement productive stress management and problem-solving strategies"), child anxiety resources, group therapy, family/sibling therapy, "an evidence-based therapeutic approach shown to improve behavior patterns of children with symptomatology linked to trauma, depression, poor mood control and anxiety[,]" "evidence-based techniques" focusing on "process[ing] grief and loss[,]" and "[c]onsultation with a behavioral specialist to assist in developing a behavior management program in home and school[.]"

Mother also introduced a copy of the Status Report to the Court filed by the Department in November 2024. This report indicates, "The permanency goal for [Tim] and [Chris] is Family Reunification with a concurrent goal of Relative/Fictive Kin Adoption. The goals are appropriate. The required services will give [Mother] the opportunity to make the necessary changes to provide a safe and appropriate environment for [Tim] and [Chris]." To meet Tim's needs, the report recommended "Mental Health Counseling" and "Pediatrician follow up regarding depression, eating disturbance, physical and sleep[.]"

Mother admitted a copy of her family service plan which included requirements that Mother provide a home that is "safe, stable and appropriate" for the boys, build a social support system, provide monthly verification of employment, submit to random drug testing throughout the life of the case, and "work with the

caseworker throughout the life of the case to help her understand why the Department is involved."

Mother's exhibits also included two Permanency Report[s] to the Court – Temporary Managing Conservatorship filed by the Department in March 2025 and July 2025. Each report indicated the primary goal was family reunification. According to the reports Tim was receiving individual therapy as of March, and life skills and family therapy as of July, but each report also noted that Dr. Salmeron had recommended trauma therapy and group therapy.

At the conclusion of trial, the trial court terminated Mother's parental rights and made the Department Tim's permanent managing conservator. Mother timely filed this appeal.

**Standard of Review**

"[P]arental-termination cases stand apart from the rest of civil litigation in multiple important ways." *D.V. v. Tex. Dep't of Fam. & Protective Servs.*, 722 S.W.3d 854, 858 (Tex. 2025). "Actions which break the ties between a parent and child 'can never be justified without the most solid and substantial reasons.' Particularly in an action which permanently sunders those ties, should the proceedings be strictly scrutinized." *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976) (quoting *State v. Deaton*, 93 Tex. 243, 248 (1900)).

Termination requires proof by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001(b). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id*. § 101.007; *see In the Int. of J.L.,* 163 S.W.3d 79, 84 (Tex. 2005) (citation omitted). This heightened standard requiring proof by clear and convincing evidence "should not be treated as a formality." *In the Int. of H.S.*, 2026 Tex. App. LEXIS 533, at *24. It is "required because termination affects the fundamental rights of all involved—not just of parents to their children but also of children to their parents." *Id*. at *2-3. Section 161.001 is, after all, "a statute about the judicial destruction of families." *In the Int. of R.R.A.*, 687 S.W.3d 269, 284 (Tex. 2024) (Blacklock, J. dissenting). "Termination of parental rights, the total and irrevocable dissolution of the parent-child relationship, constitutes the 'death penalty' of civil cases." *In re K.M.L.*, 443 S.W.3d 101, 121 (Tex. 2014) (Lehrmann, J. concurring). Therefore, termination should be reserved for "extreme cases[.]" *See In the Int. of H.S.*, 2026 Tex. App. LEXIS 533, at *2. "[N]ot all conduct we find reprehensible justifies this most draconian of sanctions." *In the Int. of K.N.*, 2026 Tex. App. LEXIS 535, at *38.

"The clear-and-convincing standard is not just an instruction to be read to a jury; it instead has meaningful implications on appeal." *In the Int. of H.S.*, 2026 Tex. App. LEXIS 533, at *24. We cannot review whether a finding is supported by clear

56

and convincing evidence in the same way that we would review whether a finding is supported by a preponderance of the evidence. *See In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). "Evidence that might be regarded as legally sufficient to sustain a judgment in a case involving the preponderance standard might constitute no evidence in a parental-termination case." *In the Int. of H.S.*, 2026 Tex. App. LEXIS 533, at *25.

"In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). In a case tried to the bench, the trial court in its role as factfinder determines the credibility and weight of the witnesses' testimony and resolves any inconsistencies or conflicts in the evidence. *See Webb v. Crawley*, 590 S.W.3d 570, 578 (Tex. App.—Beaumont 2019, no pet.). We defer to the factfinder's credibility determinations if they are not unreasonable. *See In the Int. of J.P.B.,* 180 S.W.3d 570, 573 (Tex. 2005) (citing *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004)).

> To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard all evidence

57

that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.

If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient. Rendition of judgment in favor of the parent would generally be required if there is legally insufficient evidence.

*In re J.F.C.*, 96 S.W.3d at 266.

## Analysis

In her first issue, Mother argues the evidence is legally and factually insufficient to show that "the Department made reasonable efforts to return the child to the parent before trial but a continuing danger remains in the home that prevents the child's return to the parent under section 161.001(f)(1) of the Texas Family Code." Section 161.001(f), which became effective September 1, 2023, provides:

In a suit for termination of the parent-child relationship filed by the Department of Family and Protective Services, the court may not order termination of the parent-child relationship under Subsection (b)(1) unless the court finds by clear and convincing evidence and describes in writing with specificity in a separate section of the order that:

(1) the department made reasonable efforts to return the child to the parent before commencement of a trial on the merits and despite those reasonable efforts, a continuing danger remains in the home that prevents the return of the child to the parent[.]

Tex. Fam. Code Ann. § 161.001(f)(1). In its termination order, the trial court made the following findings:

58

**Termination Order**

…

**7.     Reasonable Efforts to Return the Child**

7.1. The Court finds by clear and convincing evidence that the Department made reasonable efforts to return the child, [TIM], to the parent. However, despite those reasonable efforts to return the child, [TIM] home to the parent, a continuing danger remains in the home that prevents return.

7.2. The Court specifically finds that those reasonable efforts include the following:

> 7.2.1. The Department created a family service plan that is narrowly tailored to address any specific issues identified.

> 7.2.2. The Department made a referral for services, provided services, or paid for services.

> 7.2.3. The Department made the following additional reasonable efforts to return the child home to the parent: The Department provided for visitation between the mother and child; The Department placed the child with the mother and attempted to conduct a monitored return home of the child with the mother.

**8.     Termination of Respondent Mother['s] Parental Rights**

….

8.4.    In accordance with §161.001(c), Texas Family Code, the Court finds that the order of termination of the parent child relationship as to [Mother] is not based on evidence that [Mother]:

> ….

> 8.4.2. is economically disadvantaged;

> ….

59

8.4.6. sought an opinion from more than one medical provider relating to the child's medical care, transferred the child's medical care to a new medical provider, or transferred the child to a new health care facility;

….

8.4.8. refused… to consent to… psychiatric or psychological treatment of the child, unless the refusal:

8.4.8.1. presents a substantial risk of death, disfigurement, or bodily injury to the child; or

8.4.8.2. results in an observable and material impairment to the growth, development, or functioning of the child[.][9]

**Section 161.001(f)**

We have not had occasion to address the requirements of Texas Family Code section 161.001(f). We agree with our sister court that although the phrases "reasonable efforts" and "continuing danger" can be found elsewhere in the Code, "we are unaware of any provision of the Texas Family Code that uses 'continuing danger' in the same manner as it is used in section 161.001(f), particularly under the relevant evidentiary standard: clear and convincing evidence." *In the Int. of T.R.*,

---

[9]The trial court's Findings of Fact and Conclusions of Law are identical to the findings in the termination order except that the finding regarding the monitored return states: "The Department placed the child with the mother and attempted to conduct a monitored return home of the child with the mother that was unsuccessful because of the continuing danger to the child *while placed with the mother*." (Emphasis added).

No. 01-25-00924-CV, 2026 Tex. App. LEXIS 3275, at *37 (Tex. App.—Houston [1st Dist.] Apr. 9, 2026, no pet. h.) (mem. op.).

As it did in *In the Int. of T.R.*, the Department argues on appeal that the meaning of the word "danger" in subsection (f)(1) can be derived from case law interpreting the word "endanger" in subsections (b)(1)(D) and (b)(1)(E) regarding predicate grounds for termination. *See id*. at *37-38; Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). While such case law may prove informative, "we cannot stop there[,]" because "[s]ection 161.001(f) requires that the danger (1) be 'continuing,' (2) 'remain[] in the home,' and (3) 'prevent[] the return of the child to the parent.'" *In the Int. of T.R.*, 2026 Tex. App. LEXIS 3275, at *38 (quoting Tex. Fam. Code Ann. § 161.001(f)).

Section 161.001(f) describes the danger that must exist in order to terminate the parent-child relationship. We "presume the Legislature included each word in the statute for a purpose[.]" *In the Int. of M.N.*, 262 S.W.3d 799, 802 (Tex. 2008) (citing *Eddins-Walcher Butane Co. v. Calvert*, 298 S.W.2d 93, 96 (Tex. 1957)). "[W]e interpret statutes under the assumption that the Legislature tries to say what it means, therefore, the plain language of the statute is 'the surest guide to legislative intent.'" *Presley v. Gulf States Utils. Co.*, No. 09-10-00039-CV, 2010 Tex. App. LEXIS 8668, at *15-18 (Tex. App.—Beaumont Oct. 28, 2010, pet. denied) (quoting *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 865-66 (Tex.

61

1999)). "[W]hen we stray from the plain language of a statute, we risk encroaching on the Legislature's function to decide what the law should be." *Fitzgerald*, 996 S.W.2d at 866.

First, the statute uses temporal language requiring the State to prove a "continuing" danger that "remains" despite reunification efforts. *See* Tex. Fam. Code Ann. § 161.001(f)(1). While we acknowledge that a parent's pattern of prior conduct may permit an inference that such conduct might continue in the future, we also agree with our sister court that section 161.001(f) focuses on the parent's "*recent* history and engagement, or lack thereof, with the Department and its reunification efforts." *In the Int. of M.N.M.*, 708 S.W.3d 321, 332 (Tex. App.— Eastland 2025, pet. denied) (emphasis added); *see also In the Int. of T.D.-B.*, No. 06-25-00054-CV, 2025 Tex. App. LEXIS 9783, at *43 (Tex. App.—Texarkana Dec. 19, 2025, pet. denied) (mem. op.) (Rambin, J., dissenting) ("[T]o give effect to 'continuing,' what has happened before should be attenuated by what has happened since, and a greater emphasis should be placed on the circumstances at the time of the final hearing."). Therefore, although conduct and circumstances in the distant past may be relevant, the plain language of the statute requires the trial court to pay particular attention to more recent conduct and circumstances existing in the time period after removal, during reunification efforts, and leading up to the "commencement of a trial on the merits[,]" to determine whether the State has met

its burden to prove by clear and convincing evidence that "a continuing danger remains[.]" *See* Tex. Fam. Code Ann. § 161.001(f)(1).

Secondly, the statute uses locational language requiring proof of a danger "in the home[.]" *See id.* The plain language of the statute directs the trial court's attention to evidence regarding the circumstances and conditions existing in the parent's home during the relevant time frame to determine whether the State has met its burden to prove by clear and convincing evidence that despite reasonable reunification efforts "a continuing danger remains in the home[.]" *See id.*

Lastly, the statute uses qualitative language indicating the danger must be such that it "prevents the return of the child to the parent." *See id.* This phrase directs the trial court's attention to evidence regarding the degree of danger as well as evidence linking the danger to the parent. According to the plain language of the statute, before the parent-child relationship may be terminated, the trial court must find that the State has proven by clear and convincing evidence that returning the child to the parent is not a viable option.

**Tim's Medical Condition and Removal Against Medical Advice**

The Department argues the evidence is sufficient to establish a continuing danger due to Tim's medical condition. The Department claims, "Despite admitting [Tim] was violent and potentially homicidal and his diabetes was life-threatening, [Mother] demonstrated a pattern of refusing treatment for him, withheld medical

supplies from him just two months prior to trial, recited incorrect medical requirements for him at trial, and admitted she did not know his current target glucose or medications."

Regarding medical supplies, Duran testified that when the boys were placed with Mother for monitored return in July 2025, Mother arranged for Tim's medical supplies to be delivered to her home, but after Tim was placed with Hailey following his discharge from inpatient psychiatric hospital in August 2025, Hailey reached out to Duran to see if she could get the Dexcom readers from Mother since Tim was running out. Duran testified, "[I]t took me a week to get those Dexcoms." She explained that she originally asked Mother to communicate directly with Hailey about the Dexcoms, but Duran ultimately picked up the Dexcoms from Mother at work and delivered them to Hailey. When asked why this became necessary, Duran testified:

A.     From my understanding, there -- they were not meeting with each other's schedule. I said, "Okay, that's fine. Let me go ahead and take care of it." So that's what happened.

Q.     Okay. So based on what you understand, there was a conflict in the schedule between the two of them?

A.     Yeah. From my understanding, yes.

Q.     Okay. They both work, correct?

A.     Correct.

The evidence is legally insufficient to enable a reasonable factfinder to form a firm belief or conviction that a continuing danger remains in the home preventing Tim from being returned to Mother based on the Department's assertion that Mother "withheld medical supplies from [Tim] just two months prior to trial."

The record also does not support the Department's claim that Mother did not know Tim's "target glucose or medications." When asked to list the medications Tim was taking when he went to UT Health, Mother listed Jornay, Adderall, Vyvanse, Risperidone and Intuniv. No witnesses testified otherwise, and there are no medical records from that time frame. When asked for her understanding regarding a normal range for Tim's glucose levels, Mother testified, "his target is a hundred but with Type 1 diabetes you…" at which time a non-responsive objection was lodged. Mother also testified she understood 70 to be too low, and 300 to be too high. Mother's testimony is largely consistent with the medical records which contain a graphic display of Tim's continuous glucose monitoring readings with the "Target Range" listed as 70-180, with 50 labeled "below low threshold[,]" and with 350 labeled as "above high threshold[.]" If anything, Mother's understanding of a slightly narrower range of numbers could encourage her to seek medical intervention sooner rather than later. The only other witness who provided any testimony on the subject was Jefferson Rampy, the paramedic who testified, "Anywhere between 80 and 120 is considered normal levels."

65

Our need to resort to the medical records and a paramedic's testimony for information about Tim's low, high and target blood-glucose levels exposes a more significant problem for the Department with respect to its broader assertions that there is a continuing danger to Tim due to Mother's medical neglect or mismanagement: the Department did not present any competent expert evidence that if Tim were returned to Mother, he would be in medical danger. Instead, the Department relies on evidence that Tim has experienced blood-sugar spikes while in Mother's care, from which evidence we are essentially asked to infer not only that Mother was the cause of the blood-sugar spikes, but also that if Tim were returned to Mother she would continue to cause more spikes in the future and that Tim will be in significant medical danger as a result. There are at least two problems with the inference advocated by the Department: first, the evidence does not support the Department's premise that Tim experienced significant medical issues only while in Mother's care, and secondly, even if the Department's premise were true, or even generally true, evidence of association is not evidence of causation. *See Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 724 (Tex. 1997). "The general rule has long been that expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors." *Guevara v. Ferrer*, 247 S.W.3d 662, 665 (Tex. 2007) (discussing medical conditions allegedly caused by an auto accident). On the other hand, "the causal connection between some

66

events and conditions of a basic nature (and treatment for such conditions) are within a layperson's general experience and common sense." *Id*. at 668. Synthesizing the general rule and its exceptions, the Court in *Guevara* reaffirmed that "competent evidence is required to prove the existence and nature of a condition and a causal relationship to the event [in question] even though, in limited circumstances, the existence and nature of certain basic conditions, proof of a logical sequence of events, and temporal proximity between an occurrence and the conditions can be sufficient to support a [fact-]finding of causation without expert evidence." *Id*. at 667.

While the existence of type 1 diabetes as a serious condition is within the common knowledge of most laypeople, the specifics of how to manage the condition and avoid blood-sugar highs and lows are not. Nor are the differences between, and risks associated with, hyperglycemia, ketosis and diabetic ketoacidosis. Most importantly, the ordinary layperson does not know the various reasons that a type 1 diabetic may experience an elevated blood-glucose level requiring medical treatment. The records indicate Tim's blood-sugar spikes occurred sporadically over the course of several years, sometimes when he had been left with a family member. According to the records, "Infection or illness may cause the body to produce certain hormones that work against insulin and may trigger an episode of DKA. Other possible triggers include stress, physical or emotional trauma, high fever, surgery,

alcohol or drug abuse." The medical records reveal some of Tim's blood-sugar spikes may have been related to Omnipod malfunctions, Tim's non-compliance due to "diabetic burnout" or sneaking late-night snacks while playing video games, and others may have been due to inadequate supervision or lack of refrigeration of insulin while Mother was homeless.[10] The records do not express causation opinions based on reasonable medical probability, but only the "possible" causes that were "thought" or "suspected" by the medical professionals to be the culprit. "When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). "In cases requiring clear and convincing evidence, even evidence that does more than raise surmise and suspicion will not suffice unless that evidence is capable of producing a firm belief or conviction that the allegation is true." *In re K.M.L.*, 443 S.W.3d 101, 113 (Tex. 2014). Without expert testimony, there is no competent evidence of a causal link between Mother's conduct and Tim's blood-sugar spikes.

The records include the physicians' admonitions to Mother and Tim about a range of medical conditions that might possibly result from elevated blood-glucose levels, but the records do not indicate which conditions are reasonably probable, nor

---

[10]The trial court's termination order states it is not based on evidence of Mother's economic disadvantage.

is there sufficient evidence to meet the heightened standard requiring clear and convincing evidence. There is no question Tim faces potential dangers from his medical condition. But whatever may be inferred from the medical records and lay witness testimony, we conclude the evidence is insufficient to enable a reasonable factfinder to form a firm belief or conviction that Mother was the cause of any such danger.

The Department also claims Mother exposed Tim to medical danger by removing him from hospitals against medical advice. There was no medical testimony to that effect. Instead, we are apparently asked to make at least two inferences: first, that leaving against medical advice is always dangerous, and secondly, that since Mother has done so in the past, she will do so in the future despite her compliance with the family service plan which the trial court found was "narrowly tailored to address any specific issues identified."[11] We conclude that the Department failed to provide medical testimony or other clear and convincing evidence Tim would face a continuing danger due to Mother's alleged propensity to remove him against medical advice in the past. In reaching this conclusion, we considered each of the seven instances the Department relies on as evidence that

---

[11]One of those issues was that Mother "has difficulty understanding that she is putting her children at risk with their health when she removes them from the hospital without full treatment[.]"

Mother's pattern of removing Tim against medical advice constitutes a continuing danger.

On December 5, 2018, Mother removed Tim from TCH The Woodlands because she perceived it was taking too long for a doctor to see Tim. She told the staff that she would take Tim to Memorial Hermann, and Memorial Hermann later confirmed that she did. After Memorial Hermann discharged Tim, Mother continued to monitor Tim's condition and called TCH's endocrinology department, followed their advice, and took Tim to TCH West Tower where Mother "yelled" at the staff because she perceived they were not checking his blood-sugar levels often enough. Even when viewed in the light most favorable to the trial court's findings, this is not clear and convincing evidence of a continuing danger. Moreover, the trial court specifically did not consider Mother's transferring Tim from one medical facility to another as evidence supporting termination. Therefore, the hospital visits on December 5, 2018, do not support the trial court's finding under section 161.001(f).

On June 23, 2019, Mother took Tim to the emergency room in Kingwood but left against medical advice after about an hour because she perceived it was taking too long. Mother and Tim arrived at TCH The Woodlands thirty-four minutes later. Once again, these hospital visits do not support the trial court's finding under section 161.001(f).

On June 15, 2023, Mother had Tim transported to TCH West Tower because she was concerned about his mental health. The hospital recommended that he be admitted to an inpatient psychiatric facility. He was medically cleared, but twenty-two hours later no facility had accepted him, so Mother removed him from the hospital against medical advice. In the absence of expert testimony, and because Tim was medically cleared, there is insufficient evidence that Tim was at "substantial risk of death, disfigurement or bodily injury" nor that removing Tim "result[ed] in an observable and material impairment to the growth, development, or functioning of the child[,]" without which Mother's refusal to consent to psychiatric care was not considered as evidence supporting termination according to the trial court's termination order. Therefore, Mother's removing Tim on June 16, 2023, does not support the trial court's finding under section 161.001(f).

On October 9, 2024, Tim was transported to TCH The Woodlands out of concern for his mental health. Inpatient psychiatric care was recommended, and Mother initially agreed, but she later refused consent to transfer Tim because she believed the psychiatric facility was related to TCH. Tim had been medically cleared by that time, and there is no competent evidence that Tim faced a "substantial risk of death, disfigurement or bodily injury" nor is there competent evidence that Mother's removing Tim "result[ed] in an observable and material impairment to the growth, development, or functioning of the child." Moreover, although the

Department criticizes Mother for not following through with inpatient psychiatric care for Tim on October 9, 2024, there is no evidence the Department sought any such care for Tim two weeks later when it removed Tim from Mother's care and became Tim's temporary managing conservator. In fact, no such care was implemented until August 2025, and that was done at Mother's request, rather than the Department's. We conclude Mother's removing Tim on October 10, 2024, does not support the trial court's finding under section 161.001(f).

This leaves June 8, 2020, July 9, 2021, and September 8, 2024, as the instances of Mother's removing Tim against medical advice that may have been considered by the trial court to support its findings under section 161.001(f). However, there is no evidence Mother's removing Tim from the hospital on these three occasions (or, for that matter, any of the other four occasions) posed any significant danger to Tim's health. Mother testified Tim was always okay after they left a hospital, a self-serving statement the trial court was free to disbelieve, but there is no testimony or medical record indicating that Tim ever experienced any adverse consequences after being removed against medical advice, and no witness, expert or otherwise, testified Tim was ever in any danger as a result of being removed from a hospital. Without such evidence, there is no evidence of a danger in the recent past from which a continuing danger could be inferred.

In addition to the seven instances cited by the Department, the Department cites the opinions of lay witnesses who testified that Tim would face a continuing danger due to Mother's propensity to remove him from hospitals against medical advice. But the lay opinions suffer from the same problem: four of the seven removals are not to be considered in the analysis, and there was no evidence any of the seven removals actually endangered Tim. Moreover, none of the lay witnesses was shown to have any qualifications upon which to base such an opinion. "Bare, baseless opinions will not support a judgment even if there is no objection to their admission in evidence." *City of San Antonio v. Pollock*, 284 S.W.3d 809, 816 (Tex. 2009). Since we are not required to accept the *ipse dixit* of a credentialed witness, we certainly are not required to accept the *ipse dixit* of witnesses who have not been shown to have any credentials but who, nevertheless, express opinions requiring medical expertise. *See id*. at 818. We conclude the evidence is legally insufficient to enable a factfinder to form a firm belief or conviction that a continuing medical danger remains in the home that prevents Tim's return to Mother.

**Tim's Behavior**

The Department argues the evidence is sufficient to establish a continuing danger because Mother "remained unable to handle [Tim's] behaviors[.]" Under cross-examination, Duran testified:

Q.      [MOTHER'S TRIAL COUNSEL]: Okay. So what is it about my client as of today, snapshot, that would indicate that she is a continuing danger to this child?

A.      She is not able to handle the behavior when he gets to the point where he's being very aggressive.

Q.      So who's the dangerous one? Is it my client, or is it [Tim]?

A.      [Tim]. But what is provoking [Tim]?

Duran's question, "[W]hat is provoking [Tim]?" was never answered. Duran apparently did not know, and neither do we. The Department did not provide any expert testimony that would enable a factfinder to determine the cause of Tim's bad behavior. Instead, the Department essentially asks us to infer Mother was the cause, because according to the Department, Tim "only exhibited negative behaviors… in [Mother's] care[.]" But the undisputed evidence shows Tim exhibited negative behaviors at school, at the hospital, with a foster parent in 2022, and with Hailey (pushing) and Duran (flinging her arm) during the pendency of this case. The Department's assumption that Mother is the cause of Tim's bad behavior fails to consider that Tim's behavior may be influenced by factors unrelated to Mother, including a pattern of abuse directed at Mother and the children on the part of Tim's father, the death of Tim's father, the fact that Tim must live with a chronic disease that requires diligent monitoring and regulation of food intake and medicine, Tim's learning difficulties, and adolescence.

Dr. Salmeron's Psychological Report from January 2025 identifies several possible causes. According to the report, "Tim is functioning four years below expectation as compared to other children in his age range, suggesting handwriting and written organizational skills are developing at a slower pace than same age peers." "[L]earning differences coupled with uneven processing place [Tim] at risk for gaps in confidence, especially in the classroom (contributing factor to behavior problems)[.]" Tim showed signs of "underlying stress[,]" "repressed dysphoria and loss[,]" "powerlessness in relational situations[,]" and "low self-esteem[.]" "Test data point to risk factors for self-defeating relational habits over time (boundary regulation problems; argumentative with the teacher; patterns of domination/submis[s]ion)." Dr. Salmeron's report indicates, "[P]roduction fatigue may affect [Tim's] school performance (contributing to low motivation, inattention or disruptive behavior)." Dr. Salmeron's diagnostic impressions were: "Other Specified Trauma Related Disorder[,] Attention Deficit Hyperactivity Disorder, By History[,] Specific Reading Disorder[,] Specific Mathematics Disorder[,] Specific Disorder of Written Expression[,] Rule Out Mixed Receptive Expressive Language Disorder[,] Neglect of a Child, By Report[.]" None of the possible causes of Tim's misbehavior is stated in terms of reasonable psychological probability. Much of the report is subject to interpretation, and not within a layperson's common knowledge and experience. *See In re K.M.L.*, 443 S.W.3d at 113; *Guevara*, 247 S.W.3d at 665-

66. We conclude that Dr. Salmeron's report does not enable a factfinder to form a firm belief or conviction that Tim's bad behavior was caused by Mother.

We know from the Permanency Reports that Tim was receiving individual therapy as of March, and life skills and family therapy as of July, but Dr. Salmeron's report recommends fifty-six "School-Based Recommendations[,]" that should be considered by school personnel, forty-four "Home-Based Recommendations" that should be considered by caregivers, six "Specific Strategies for ADHD[,]" and thirty-three "Supplementary Behavior Management Strategies[.]" Dr. Salmeron did not testify. Nor did Jeremy Factors, whom Tim was seeing weekly for individual therapy as of March 2025, nor Charlotte Davis, whom Tim was seeing bi-weekly for individual and family therapy as of July 2025. Nine months passed from the time of Dr. Salmeron's report to the time of trial, and during that time, the Department was Tim's temporary managing conservator. Aside from the individual and family therapy mentioned in the Permanency Reports, there is no evidence that any of the other therapies or strategies suggested by Dr. Salmeron were ever tried at any time before placing the boys back with Mother for a monitored return in July 2025.[12]

The Department expressed concern about Mother's parenting skills in the family services plan, and Mother substantially complied with the services that were

---

[12]According to Hailey's testimony Tim completed behavioral classes at school on October 31, 2025, but there is no testimony indicating when those classes began.

tailored to address that concern, so much so that the Department placed both children with Mother for a monitored return in late July 2025. Things went well at first, but then the boys fought, Tim climbed onto the roof, 911 was called, and Tim was taken to the hospital and then released. Those medical records are not in evidence. Days later, Mother took a computer cord away, Tim grabbed a knife, Mother called 911, and at Mother's request, Tim was admitted for inpatient psychiatric care. Tim was discharged by the hospital ten days later. Those records are also not in evidence.

The Department did not provide any evidence in the form of records or testimony from a psychiatrist, psychologist or other mental health professional that Tim was a danger to himself or others at any point after he received inpatient psychiatric treatment and was discharged by the psychiatric hospital in August 2025. We don't know anything about what happened at the psychiatric hospital. Maybe a diagnosis was made, and perhaps effective medicines or therapies were administered or prescribed. We don't know, nor did the trial court, because no such evidence was provided. What we do know is that Mother had only six hours of further interaction with Tim after his inpatient psychiatric care, and during those interactions, the only incidents reported by Duran were an argument over whether Tim could take a phone to Hailey's house, and a fight in which Tim slapped and punched Chris despite Duran's and Mother's efforts to stop him. Fighting between siblings is fairly common in many households. Without more, it is not a "solid and substantial

77

reason[]" for terminating a parent's rights. *See Wiley*, 543 S.W.2d at 352. No witness testified from personal knowledge that the brothers ever resorted to weapons when fighting each other.[13] Rather, Mother reported that Tim grabbed a knife while arguing with Mother, and Chris hit Mother with a broomstick and used a knife to stab a mattress and the walls during Tim's hospitalization. The record reveals that whenever things had escalated to that level in the past, Mother called 911. Duran and Lee both agreed that Mother's reaching out for help when needed was the right thing to do, but they also both expressed concerns that things got to the point where 911 had to be called. However, these witnesses were not shown to have any mental health qualifications, and their "concerns" about what may have been triggering Tim's outbursts do not constitute competent evidence that Mother was to blame.

According to the records, Tim threatened to harm his brother on June 15, 2023, and Mother was "concerned for suicidal ideation." The evidence at trial also showed that on October 9, 2024, Tim got upset, fought with Chris and threatened to "kill everyone" and then himself. Tim's conduct on these occasions is not to be minimized, and the record indicates Mother took his threats seriously and sought help before deciding not to consent to inpatient psychiatric care on those occasions

---

[13]Stocks expressed a "belie[f]" that Tim had pulled a knife on Chris, but he was not testifying on personal knowledge, and there is no other mention of a knife in the physical altercation in early October 2024 that led to Stocks's involvement.

78

due to delay in placement or mistrust of TCH.[14] However, the evidence is legally insufficient to enable a factfinder to form a firm belief or conviction that Mother caused Tim's behavior on these occasions. The evidence does indicate Tim's grabbing a knife in August 2025 was in response to Mother's taking away a computer cord after Tim did not obey her instructions to get off the computer, but there is no evidence that Mother's doing so was in any way improper. Without legally sufficient evidence that Tim's bad behavior was caused by improper conduct on the part of Mother, the Department failed to establish by clear and convincing evidence that any continuing danger posed by such behavior "prevents the return of the child to the parent" as required by section 161.001(f).

**The Department's Other Concerns**

At trial, the Department's witnesses expressed several "concerns," but when they were specifically asked to list continuing dangers, their responses fell into two general categories: (1) Mother neglected or mishandled Tim's medical condition including removing him from hospitals; (2) Mother was unable to handle Tim's and Chris's behavior which includes fights between the boys and threating behavior directed at Mother. On appeal, however, the Department claims several other concerns amount to continuing dangers. We address each of these below.

---

[14]Again, the trial court's termination order states it is not based on evidence of Mother's refusal to consent to psychiatric care.

*Educational Needs*

The Department argues a continuing danger remains in the home because Mother is unable to meet Tim's educational needs. According to the Department, Mother "admitted [Tim] was not attending school during the monitored return two months before trial." The monitored return began in late July, and in mid-August Tim was admitted for inpatient psychiatric care. Tim's lack of school attendance while in the psychiatric hospital in August 2025 is not clear and convincing evidence of a continuing danger that prevents Tim's return to Mother. Nor is the fact that Tim attended multiple schools over the years. Mother testified she was trying to find a school that would meet Tim's specific educational needs, and although the trial court may have disbelieved this self-serving testimony, the Department did not introduce any evidence from an educator or otherwise that Tim's attending multiple schools in the past constituted a continuing danger that prevents his return to Mother. The only educator to testify, Sheldon, testified in Mother's favor.

*Criminal Liability*

The Department argues a continuing danger remains in the home because Mother "lied to officers about [Tim] assaulting her, and repeatedly subjected [Tim] to potential injury, removal, and criminal liability, including just two months before trial." The Department's witnesses agreed it was appropriate for Mother to call 911 when Tim's behavior escalated to the point that he was a danger to himself or others.

It is unclear why the Department takes the opposite position on appeal. Mother's decision to call 911 on the occasions in question do not constitute clear and convincing evidence of a continuing danger that prevents Tim's return to Mother.

*Mother's Requests for the Department to Take the Children*

The Department argues a continuing danger remains in the home because Mother "admitted she could not care for [Tim] and asked the Department to pick him up at the time of removal and again just prior to trial." Regarding the statement at the time of removal, Stocks testified Hernandez told him that Mother wanted law enforcement to pick up the children. When Hernandez was asked if she "heard somewhere" that Mother "wanted CPS to take the children[,"] she responded, "Yes." But Sergeant Sheffield could not recall Mother's saying she wanted CPS to take the children, only that "it was enough for me to believe that she just couldn't handle the chaos of the situation." Audio was played in which Mother could be heard saying "I want [the Department] to take these kids. I can't deal with this anymore." The fact that Mother made such a statement in October 2024, while she was homeless and before she substantially complied with the family service plan, is too remote to constitute clear and convincing evidence of a continuing danger at the time of trial in October 2025, as required by section 161.001(f). Regarding Mother's statement "just prior to trial[,]" Duran testified that Mother called her on August 11, saying that Tim was "having another episode." Tim was destroying property, screaming,

81

yelling, cussing and hitting her. Mother was crying and "asking if I could come pick him up, that she couldn't do this anymore." Days later, upon Mother's request, Tim was admitted for inpatient psychiatric care. As indicated above, there is no evidence Tim's emotional outburst was caused by any improper conduct on the part of Mother, nor can we find fault with Mother's requests for assistance from the Department and mental health professionals under the circumstances. Without evidence establishing Mother was the problem, evidence that Mother was exasperated to the point of requesting help from the Department or mental health professionals is legally insufficient to establish "a continuing danger in the home" preventing Tim's return.

*Mother's Impairment*

The Department argues a continuing danger remains in the home because "Dr. Stadler noted that [Mother] experienced severe impairment even on medication, which placed her at risk for neglectful parenting." Dr. Stadler did not testify. Her report, only part of which is quoted above, relates inconsistent and conflicting test results, uncertain diagnoses, unknown causation, and the need for further evaluation. According to the report, "the risk of neglectful parenting… is related to the risk of relapse." There is no evidence of any such relapse in this case. After an initial drug screen on October 29, 2024, was positive for methamphetamine in the hair, there is no evidence in the record that Mother tested positive again for controlled substances,

82

and the Department has not argued Mother's past drug use constituted a continuing danger at the time of trial. Dr. Stadler's report also mentions a risk related to Mother's "impairments in attention, memory, and executive functioning which likely lead to disorganization and impulsive, and possibly poor, decision-making." But the magnitude of this "risk" is not quantified, and Dr. Stadler's own report questions several of the findings regarding Mother's cognitive abilities. Dr. Stadler's opinions, such as they are, are not stated in terms of reasonable psychological probability. Much of the report is subject to interpretation, amounting to no more than surmise and suspicion since psychology is outside a layperson's common knowledge and experience. *See In re K.M.L.*, 443 S.W.3d at 113; *Guevara*, 247 S.W.3d at 665-66. There is nothing in Dr. Stadler's report that would enable a factfinder to form a firm belief or conviction that Mother is so intellectually challenged that she is a continuing danger to her children. The Department's argument to the contrary is inconsistent with the Department's decision to nonsuit the case regarding Chris and allow Chris to remain in Mother's care.

**The Department's Case Law**

The Department cites several cases as support for its arguments that the evidence is legally sufficient to support the trial court's section 161.001(f) findings. Some of the cases were decided before section 161.001(f) became effective and address endangerment under subsections (D) and (E) of section 161.001(b)(1). These

are cited in support of the Department's argument that endangerment cases inform the meaning of the phrase "continuing danger." As indicated above, we agree such cases, while not controlling, may be informative. Other cases involve findings, affirmed on appeal, of "continuing danger" under section 161.001(f). We find each of these cases to be distinguishable on the facts as explained below:

*In re J.H.*, No. 01-25-00854-CV, 2026 Tex. App. LEXIS 3352, at *47-55 (Tex. App.—Houston [1st Dist.] Apr. 10, 2026, no pet. h.) (mem. op.). The parents had incarcerations, instability, and a history of positive drug tests for the parents *and children*. The court of appeals held that the parents' history of instability, positive drug tests, disregard for court orders, and incarceration demonstrated a continuing danger in their home and was sufficient under 161.001(f).

*R.C. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-25-00890-CV, 2026 Tex. App. LEXIS 2010, at *24-27 (Tex. App.—Austin Mar. 4, 2026, no pet. h.) (mem. op.). In this case, Mother had substance abuse problems. Mother left Father due to domestic violence, but a week later Father returned home after apologizing, and Mother testified this was a pattern in their relationship.

*In re P.Y.*, 731 S.W.3d 672, 685 (Tex. App.—Houston [14th Dist.] 2026, no pet. h.). The appellate court cites Texas Family Code section 101.009 to determine danger. "Danger to the physical health or safety of a child includes exposure of the child to loss or injury that jeopardizes the physical health or safety of the child

without regard to whether there has been an actual prior injury to the child." *Id*. While we do not rely on section 101.009, we agree no actual injury is required. In *In re P.Y.*, the trial court held that Father's incarceration and any other home suggested by Father, were unsuitable due to "an endangering environment with accessible drugs and the threat of sexual assault[,]" demonstrating a continuing danger in the home. *Id*.

  *In re T.D.-B.*, 2025 Tex. App. LEXIS 9783, at \*14-15. Father's incarceration for drug use which prevented visitation with the child, long history of drug use during the case, and failure to show up for a drug test which resulted in a presumed-positive drug test demonstrated a continuing danger in the home.

**Conclusion Regarding Section 161.001(f)**

  Based on the record before us, we find the evidence legally insufficient to support the trial court's finding under section 161.001(f). Viewing all the evidence in the light most favorable to the finding, and disregarding all evidence that a reasonable factfinder could have disbelieved or found to have been incredible, we conclude the evidence does not enable a reasonable factfinder to form a firm belief or conviction that despite the Department's efforts to return Tim to Mother prior to the commencement of the trial, a continuing danger remains in the home that prevents the child's return to the parent.

We sustain Mother's first issue; therefore, we need not address issues two, three and four which challenge the trial court's statutory-predicate and best-interest findings.

**Fit-Parent Presumption**

In her fifth issue, Mother argues the trial court abused its discretion by appointing the Department as Tim's non-parent permanent managing conservator without rebutting the presumption that Mother is a fit parent under the standards set forth in section 153.002(b) and (c). *See* Tex. Fam. Code Ann. § 153.002(b), (c).

In 2025, the legislature added section 153.002(b) to include two rebuttable presumptions which state, "In a suit between a parent and a nonparent, it is a rebuttable presumption that: (1) a parent acts in the best interest of the parent's child; and (2) it is in the best interest of a child to be in the care, custody, and control of a parent." *Id*. at 153.002(b); *In the Int. of T.R.*, 2026 Tex. App. LEXIS 3275, at *47-48. "A nonparent may only overcome these presumptions by 'proving by clear and convincing evidence that denial of the relief requested by the nonparent would significantly impair the child's physical health or emotional development.'" *In the Int. of T.R.*, 2026 Tex. App. LEXIS 3275, at *48 (quoting Tex. Fam. Code Ann. § 153.002(c)).

Mother argues on appeal that the trial court's appointment of the Department was "an inherent natural consequence" that flowed from the trial court's decision to

terminate her parental rights, but if the evidence is legally or factually insufficient to support termination, "then as a natural consequence, the appointment of a nonparent permanent managing conservator is also invalid." Mother notes that this argument is "an analysis of first impression before this court[,]" and argues we should apply the newly enacted rebuttable presumptions in this termination case, because "since September 1, 2025, the non-parent is now faced with the heightened standard from preponderance of the evidence to 'clear and convincing,' placing conservatorship issues on equal ground with termination." We agree.

By its own language, the presumption provided by section 153.002 applies only in a suit between a parent and a nonparent. The Department is not Tim's parent. Nevertheless, the Department argues that "in no instance could the use of the term 'nonparent' in the chapter 153 provisions be construed as applicable to the Department[,]" because other sections in chapter 153 use the phrase "nonparent, a licensed child-placing agency, or the Department." *See* Tex. Fam. Code Ann. §§ 153.371, 153.372, 153.373, 153.376. According to the Department, this phraseology indicates "nonparent" is a category separate from licensed child-placing agencies and the Department, and if the legislature had intended the presumption in section 153.002 to apply in cases filed by the Department, it would have specifically said so, instead of merely stating that the presumption applies in suits between parents

87

and nonparents. The Department argues we should construe "nonparent" in the broader context of the other sections in chapter 153.

The meaning of "nonparent" is not unclear; it refers to parties other than parents. The statute does not define "nonparent." "Unless the statute provides a separate definition, we presume that the Legislature meant to use the ordinary meaning of a word, with each term 'interpreted consistently in every part of [the] act.'" *Sunstate Equip. Co. v. Hegar*, 601 S.W.3d 685, 690 (Tex. 2020) (quoting *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002)).

That said, when we to resort to other sections in chapter 153, we must include section 153.005(b) which states, "A managing conservator must be a parent, a competent adult, the Department of Family and Protective Services, or a licensed child-placing agency." *Id*. § 153.005(b). Tellingly, this section does not use the term "nonparent" as if it were a category separate from competent adults, the Department and child-placing agencies. Borrowing the Department's interpretive tool, section 153.005(b) would have to be understood as listing three categories (competent adults, the Department and child-placing agencies) that are distinct from the first category, "parents." In other words, competent adults, the Department and child-placing agencies are not "parents;" they are "nonparents." We also must consider section 153.131(a) since both that section and section 153.002(b) require a court to find that the appointment of a parent "would significantly impair the child's physical

88

health or emotional development" before refusing to make that parent a managing conservator. *Compare id*. § 153.002(b), *with* § 153.131(a). In light of section 153.131(a), we construe "nonparent" in section 153.002(b) to include the Department, because sections 153.131(a) and 153.002(b) both address the same presumption, and courts have already applied the presumption in section 153.131(a) to original proceedings in which the Department seeks both termination and conservatorship. *See In the Int. of J.A.J.,* 243 S.W.3d 611, 615 (Tex. 2007) (construing previous version of section 153.002 and concluding the trial court's findings "that appointment of a parent as J.A.J.'s managing conservator would not be in his best interest because it would significantly impair his physical health or emotional development… satisfy not only the fundamental requirement that the court consider the best interest of the child, *see* [Texas Family Code section] 153.002, but also the more specific findings necessary to justify the Department's appointment under section 153.131."). Because section 153.131(a) already creates a fit-parent presumption in cases filed by the Department, and because section 153.002(b) reflects the Legislature's decision to require clear and convincing evidence to overcome that presumption in suits between parents and nonparents, we reject the Department's argument and conclude the presumption in section 153.002(b) applies in a suit between a parent and any party who is not a parent, including the Department.

Section 153.002(c), also enacted in 2025, states:

(c)     In a suit between a parent and a nonparent, the nonparent may overcome the presumption under Subsection (b) by proving by clear and convincing evidence that denial of the relief requested by the nonparent would significantly impair the child's physical health or emotional development.   If the court renders an order in the suit granting relief to the nonparent, the court shall state in the order:

(1)     the specific facts that support the court's finding that denying the relief requested by the nonparent would significantly impair the child's physical health or emotional development; and

(2)     the extent to which the nonparent has overcome the presumption under Subsection (b).

Tex. Fam. Code Ann. § 153.002(c). Although the trial court found in the termination order "that the appointment of [Mother] as permanent managing conservator of the child is not in the child's best interest because the appointment would significantly impair child's physical health or emotional development[,]" the trial court did not include "the specific facts that support the court's finding" as required by section 153.002(c)(1). Mother timely requested findings of fact and conclusions of law, and the trial court once again found that "appointment of [Mother] as permanent managing conservator of the children the subject of this suit is no[t] in the children's best interest because the appointment would significantly impair the child's physical health or emotional development[,]" but once again did not include "the specific facts that support the court's finding" as required by section 153.002(c)(1).

90

Texas Rule of Civil Procedure 299 provides that "when one or more elements [of a claim or defense] have been found by the trial court, omitted *unrequested* elements, when supported by evidence, will be supplied by presumption in support of the judgment." Tex. R. Civ. P. 299 (emphasis added). Rule 298 provides that after the trial court delivers its original findings of fact and conclusions of law, any party may request specified additional findings or conclusions, and "[n]o findings or conclusions shall be deemed or presumed by any failure of the court to make any additional findings or conclusions." *Id*. 298. Mother timely requested additional findings of fact and conclusions of law, specifically requesting the trial court "to identify the specific facts that supports (sic) the finding that denying the relief of termination and conservatorship requested by the Department, the nonparent, would significantly impair [Tim's] physical health or emotional development, as required under TEX. FAM. CODE § 153.002(c)(1)." No such additional finding was forthcoming. Therefore, according to Rules 298 and 299, the omitted finding required by section 153.002(c)(1) may not be supplied by presumption in favor of the termination order. *See* Tex. R. Civ. P. 298, 299; *Chapa v. Reilly*, 733 S.W.2d 236, 237-38 (Tex. App.—Corpus Christi 1986, writ ref'd n.r.e.). In the absence of the finding required by section 153.002(c)(1), the trial court abused its discretion in appointing of the Department as Tim's permanent managing conservator.

We sustain Mother's fifth issue. Therefore, we need not address Mother's sixth issue challenging on other grounds the trial court's appointment of the Department as Tim's permanent managing conservator.

**Conclusion**

Having sustained Mother's first issue asserting the evidence was legally insufficient to establish a continuing danger in the home prevents Tim's return to Mother, and fifth issue asserting the trial court abused its discretion in appointing the Department as Tim's permanent managing conservator, we reverse the trial court's order and render judgment that Mother's parental rights are not terminated, and the Department is not appointed as Tim's permanent managing conservator. Inasmuch as Mother is Tim's only surviving parent and is the only person with the rights and duties of a parent, we need not remand any portion of this case to the trial court for any further proceedings.

REVERSED AND RENDERED.

KENT CHAMBERS
Justice

Submitted on April 13, 2026
Opinion Delivered July 6, 2026

Before Golemon, C.J., Wright and Chambers, JJ.

92